## Chenoweth, et al. v. Bullitt, et al.

(Decided May 25, 1928.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1.  Powers.—If holder of power of appointment enters into an agreement with a person whom he proposes to appoint that he will make the appointment for an advantage to accrue to himself from the appointee, the exercise of the power is fraudulent, since the power is in the nature of a trust and the exercise thereof must substantially carry out the donor's directions.

2.  Powers.—Devise of property by donee of power of appointment to brother, subject to condition that brother pay off donee's debts and pay wife annual sum, held not void for fraud, on ground that there was a "bargain behind" by which donee was to reap advantage from appointment, notwithstanding indebtedness of donee to his brother, where will provided for disclaimer.

3.  Powers.—Where intention of donee of power of appointment in imposing condition on appointee in the exercise of the power is not to benefit the appointee unless and except some benefit result to the donee or another not the object of the power, the appointment is fraudulent and void, since the corrupt intention vitiates the grant as well as the unauthorized condition.

4.  Powers.—Where original testator devised property to son and his wife and survivor for life with power of appointment to son to devise property to testator's lineal heirs in default of issue, and the donee of the power devised property to his brother on condition that his brother should pay off the donee's indebtedness, and should pay an annuity to his wife, and where it was expressly provided in donee's will that, if the brother did not care to accept the conditions, the estate should go as in default of appointment, the execution of the power was void, because fraudulent in a technical sense as having been made for a purpose foreign to the power.

5.  Perpetuities.—If interest vests within time prescribed by rule against perpetuities, under Ky. Stats., sec. 2360, it is not obnoxious to the rule, though it may end beyond such time.

6.  Perpetuities.—Rule against perpetuities declared in Ky. Stats., sec. 2360, deals with possibilities and not probabilities of vesting estates within lives in being plus 21 years and 10 months.

7.  Perpetuities.—Where will gave life estate to testator's widow, and after her death property was to go to testator's son and his then wife during their natural lives and to the survivor, and on the death of the survivor to their children or lineal descendants, or to testator's lawful heirs, held, that devise to son and wife was void as to limitations following the life estate of the son's wife, under Ky. Stats., sec. 2360, which provides that the absolute power of alienation shall not be suspended for longer period than during

continuance of lives in being at the creation of the estate and 21 years and 10 months thereafter.

8. Wills.—Where will gave life estate to testator's widow, and after her death property was to go to testator's son and his then wife for period of their natural lives with limitation over to son's descendants on death of son and his wife and in default thereof to testator's lawful heirs held, that life estate was vested in son's wife, notwithstanding limitations following her life estate were void, under Ky. Stats., sec. 2360, for remoteness because of possibility of failure to vest within period of lives in being plus 21 years and 10 months.

9. Perpetuities.—Where will gave life estate to testator's widow, and after her death property was to go to testator's son and his then wife during the period of their natural lives with remainders over, held, that rule against perpetuities as to life estate of son's wife, was not violated under Ky. Stats., sec. 2360, on account of requirement that two persons concur to alienate the property absolutely.

10. Life Estates.—Evidence held to sustain finding that son's widow, given life estate in property devised son by testator, had not surrendered life estate to person appointed by son in exercise of power of appointment under will, by voluntarily acknowledging appointee's claim to hold the land adversely.

11. Wills.—Where testator devised property to son and his wife for lives of both with power of appointment to son, renunciation by son's widow of son's will by which power of appointment was exercised held not to constitute surrender of her life estate, under Ky. Stats., secs. 1404, 2067.

12. Remainders.—Suit by heirs of testator against heirs of a person appointed under power of appointment given in will to life tenant to appoint remaindermen, brought for purpose of setting aside the attempted exercise of the power of appointment for fraud, held not barred by 5 or 10 year statute of limitations (Ky. Stats., sec. 2515, 2519), though over 10 years had expired since perpetration of the alleged fraud, where there was an intervening life estate given wife of donee of power of appointment.

13. Remainders.—Action by remaindermen for sale of property and division of proceeds is not subject to commencement of limitation until such time as remaindermen have right to demand possession, which time did not accrue until expiration of intervening life estate.

14. Powers.—Attempted exercise by donee of power of appointment under will by making devise of property on condition of devisee's payment of donee's debts and annuity to his wife, where fraudulent, as contrary to purpose of the power of appointment, was not merely voidable, but void, and cause of action of original testator's heirs as remaindermen accrued and statute of limitations commenced to run, not from the date of the perpetration of the alleged fraud, but from termination of the intervening life estate, in suit to set aside the exercise of the power and for sale and division of the property.

15. Improvements.—Persons in possession of property under claim of right were not entitled to claim value of improvements placed on property, but only the increase in the property's vendible value by reason of the improvements.

16. Improvements.—Widow of appointee under unauthorized exercise of power of appointment held entitled to recover enhancement of vendible value of property during period of her possession, where improvements were made in good faith in belief that she was the owner; power of appointment having been fraudulently exercised by donee of power by attaching conditions contrary to the intent of the testator.

17. Estoppel.—Estoppel cannot be considered where it has not been pleaded.

TRABUE, DOOLAN, HELM & HELM, JAMES W. STITES and T. KENNEDY HELM for appellants.

HELM BRUCE, POPE NICHOLAS and LEO T. WOLFORD for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

Wm. C. Bullitt died in 1877. He devised a tract of 253 acres to his son Henry M. Bullitt in the following manner:

"On the death of my wife—and no sooner—the whole Oxmoor tract, including that in Henry's occupancy, shall be divided equally between all my children, charging each with all advancements. Henry's portion shall be subject to the following provision: .. . . It is devised to Henry and his then wife during their natural lives and to the survivor for life, and at the death of Henry and wife, his child or children, if any, or their lineal descendants —if none, to my lawful heirs. . . . If Henry has at his death no lineal descendants he may devise the premises to one or more of my lineal heirs, but to no other person."

Wm. C. Bullitt's widow, the first life tenant, died in 1879. From that time until his death in 1908, Henry Bullitt by his lessee occupied the land. Leaving no lineal descendants, Henry Bullitt by his will and codicils undertook to exercise the power conferred upon him by his father's will. In the second clause of his will, Henry Bullitt stated that he was indebted to his wife, Mary Louisa Bullitt, in the sum of $4,000, and was further in-

debted to various other persons in the total sum of about $3,000, as set out in an itemized statement attached to his will. He then in this clause recited that it was his wish and desire to settle all of said indebtedness and that, inasmuch as he was empowered under his father's will to devise his property, he hereby devised the 253 acres mentioned in his father's will to his brother, Thomas W. Bullitt:

"Upon the condition, however, that my said brother shall fully pay off and discharge all of said enumerated indebtedness which may be undischarged at the time of my death, and further, that my said brother, Thomas W. Bullitt, shall, during the life of my said beloved wife, pay to her annually the sum of $600, and if my said brother, Thomas W. Bullitt, should not desire to take this property under this devise, and subject to these conditions, it is my wish and desire, and I now devise the said property to my wife, Mary Louisa Bullitt, during her life, and at her death the same to descend as under my father's will."

In this same clause of the will the testator then wrote that Thomas W. Bullitt had fully considered with him the question of the latter's indebtedness referred to in this will, and had agreed to aid and assist the testator in paying off and discharging said debts. The clause further provided that the option of Thomas W. Bullitt "to accept the terms and conditions of this will, shall be sufficient expressed if he accepts the same in writing at the time the said will is probated, his acceptance to be noted by order of the county court at said time." By the first codicil to his will Henry Bullitt, after reaffirming the provisions of his original will, except to the extent they were modified by the codicil, provided that, if Thomas W. Bullitt should die before he did, then the heirs of Thomas W. Bullitt should have the privilege of accepting the provisions of the will made in behalf of Thomas W. Bullitt, subject to conditions thereof, and under the obligation that the heirs should fulfill the conditions which were therein imposed upon Thomas W. Bullitt. By the third clause of the codicil, after reciting that his nephew Wm. C. Bullitt, of Philadelphia, had kindly assisted him in discharging some of his indebtedness, which he had been unable to repay, the testator in token of his appreciation of such kindness devised 20 of

the 253 acres in question to him. He further devised 20 acres of this land to another nephew, one of the plaintiffs herein, James S. Chenoweth, in recognition of the latter's kindness to him as a family physician. The second codicil has no bearing on the present controversy. Four months after Henry Bullitt's death his will was admitted to probate, and on the same day Col. Thomas W. Bullitt filed in the county court his written acceptance of the terms and conditions of the will, which was ordered noted of record. Within a year thereafter, and just before the year expired, Henry W. Bullitt's widow duly renounced the will of her husband and claimed her dower and distributable share of his estate. In the interval between Henry M. Bullitt's death and the renunciation of his will by his widow, Col Thomas W. Bullitt and Mrs. Henry M. Bullitt had various conversations with regard to the fulfillment by the former of the conditions imposed upon him by his brother's will. Apparently he made no claim that the debt of $4,000 had been paid to his sister-in-law during his brother's lifetime, for he offered to make the payments called for by the will. Mrs. Henry Bullitt, however, insisted that, in addition to the payments called for by the will, she should have the rents and profits of the land during her life. We agree with the chancellor that, while the record is not absolutely clear on this point, it is reasonably certain that she demanded this as of right claiming a life estate under the will of her father-in-law, Wm. C. Bullitt. Col. Thomas W. Bullitt declined to accede to Mrs Henry Bullitt's demand, but on what ground we do not know. That Henry Bullitt intended that his widow should have only the payments provided for in his will is clear, since he gave her a life estate in the land only in the event of his brother's refusal to comply with the conditions annexed to the appointment. Probably Mrs. Bullitt recognized that this was so, since she never undertook to compel Col. Bullitt to make the payments called for by her husband's will, though she did endeavor to obtain by negotiation the benefit of that will as well as that of the will of her father-in-law. Thus Mrs. Bullitt and Col. Bullitt reached an impasse. However, Mrs. Bullitt continued until her death to have the use of the land in question. The appellants contend that she held the land during this period as the life tenant under the will of her father-in-law. The appellees contend that she held it as Col. Bullitt's tenant at sufferance or at will. We will dispose

of this issue when we come to discuss the plea of limitation under which it properly falls.

Mrs. Henry Bullitt died March 9, 1924; Col. Thomas Bullitt having predeceased her in 1910. On the death of Mrs. Henry Bullitt, Mrs. Annie L. Bullitt, the relict of Col. Thomas Bullitt, took possession of the land in question as the devisee of her husband. She made certain improvements on the property to the alleged amount of $13,100.33. On June 10, 1925, this suit was brought by seven of the grandchildren and two of the great-grandchildren of Wm. C. Bullitt, with whom were joined the spouses of those who were married. The plaintiffs claimed that they were the joint tenants with the twenty-one defendants of the property in question, and so claiming they prayed for a sale of the property and a division of the proceeds. The defendants were ten grandchildren, eight great-grandchildren, and three great-great-grandchildren of Wm. C. Bullitt, and the consorts of such of them as were married, with whom later was joined the Fidelity & Columbia Trust Company, trustee under the will of Annie L. Bullitt, who was originally a defendant herein, but who died pending this action, leaving a will by which she devised the property involved to the Fidelity & Columbia Trust Company upon certain trusts. In their petition the plaintiffs averred that the appointment made by Henry M. Bullitt in his will to Col. Thomas Bullitt was void because tainted with fraud. The defense was first a denial that the exercise of the power by Henry Bullitt was tainted with any fraud, then the pleas of the 5, 10, and 15 year statute of limitations, and, lastly, a claim for the value of the improvements put upon the property in the event the plaintiffs were successful in the suit. The reply put in issue the affirmative allegations of the answer. On final hearing, being of the opinion that the appointment by Henry M. Bullitt worked no fraud upon the power, the chancellor dismissed the petition of the plaintiffs, and from that judgment this appeal is prosecuted.

We are met at the threshold of this case by a consideration of whether or not the execution of the power by Henry M. Bullitt worked a fraud on that power, for if, as the chancellor found, it did not, that is the end of this case. In Bispham's Principles of Equity, sec. 256, it is said:

"If a power is not exercised in good faith and for the purposes for which it was created, its exer-

cise will be deemed fraudulent in equity and will be set aside upon a bill filed by a party in interest. A case in which a power is thus improperly exercised is said to be a case of 'a fraud upon the power.' The plainest case of a fraud upon a power is where the power is exercised for the personal advantage of the appointor.''

In Degman v. Degman, 98 Ky. 717, 34 S. W. 523, 17 Ky. Law Rep. 1310, this court expressed the rule thus:

"It is likewise well settled that the power of appointment must be exercised for the benefit of the parties entitled thereto, and not with a view of benefiting the appointor or donee of the power to appoint, and that an appointment or division made for the purpose of benefiting the appointor is in law fraudulent and void.''

In accordance with this principle, it is well settled that, if the holder of a power of appointment enters into an agreement with the person whom he proposes to appoint that he will so appoint for an advantage to accrue to himself from the person to whom the appointment is to be made, an exercise of the power under such circumstances is fraudulent. This is what is called in the books "a bargain behind." Illustrative of the application of this principle is the case of Degman v. Degman, supra. There the testator devised property to his widow for life with power to dispose of the same "among my children as she may think best." During her life she conveyed all of the property to one child on condition and under an agreement that such child pay her debts and maintain her and her second husband for life. It was held that the exercise of the power was fraudulent. To the same effect are Luke v. Marshall, 5 J. J. Marsh. 354; Shank v. Dewitt, 44 Ohio St. 237, 6 N. E. 255; Beatson v. Bowers, 174 Ind. 601, 91 N. E. 922; Bostick v. Winton, 1 Sneed (Tenn.) 524; and cf. Holt v. Hogan, 58 N. C. 82; Thompson's Ex'rs v. Norris, 20 N. J. Eq. 489.

A power is in the nature of a trust. It may be left unexercised, but, if exercised, it must substantially carry out the donor's directions. For the donee to exercise it for a selfish purpose is as much of a breach of trust as for a trustee of an express trust to deal with the trust res for a selfish purpose. In the present case, we agree with the chancellor in his finding that there was no evi-

dence of "any bargain behind" between Col. Bullitt and Henry M. Bullitt, unless it can be inferred from the recitals in Henry Bullitt's will that his brother had considered with him the question of his indebtedness and had agreed to assist him in discharging it. As to this we quote with approval from the chancellor's opinion:

"No doubt this was true. It appears that Col. Bullitt had 'several times' paid his brother out of debt and the pecuniary difficulties of this apparently improvident person must have been a frequent subject of 'consideration' between him and his only living brother. Gratitude for this repeated assistance must have constituted a powerful motive, as it was certainly a legitimate motive, for the appointment that was made. But surely it would be unwarranted to base a finding of a fraudulent bargain upon the recitals of this will. Some of them are, perhaps, consistent with the theory of a bargain. But they are also consistent with the supposition that Henry Bullitt made these recitals in order to explain to the other subjects of the power, his nieces and nephews, that it was gratitude to his brother for favors, past and expected, which induced him to prefer his brother to the other branches of the family, just as it was the avowed motive of the appointments to two of his nephews.

"There are three pieces of evidence which are opposed to the theory of a bargain. Col. Bullitt's son has declared that his father told him that he knew nothing whatever of Henry Bullitt's will until after his death. And the first codicil to Henry Bullitt's will furnishes internal evidence that there was no bargain with his brother. In that codicil he appointed 20 acres of land to his nephew, Wm. C. Bullitt, of Philadelphia, in appreciation of advances of money to assist in paying off the indebtedness 'mentioned in the body of his will.' Now, this was the very indebtedness which, if there was a bargain, Col. Bullitt had undertaken to discharge and it seems highly improbable that Henry Bullitt would have applied in another quarter for assistance in discharging debts from which he had been relieved by his brother's assumption of them.

"And the original will itself confirms the impression that there was no bargain; for provision is there made for the contingency of a disclaimer by

Col. Bullitt of the appointment. . . . What could be more unnatural than this contemplation of a positive refusal of the appointee to take property for which, upon the hypothesis of a bargain, he had paid or had agreed to pay a stipulated price? Why offer an 'option to accept' to an appointee who had already accepted? I think there is no showing of a bargain between donee and appointee."

This, however, does not dispose of the question, for we must yet decide whether, despite the fact that there was no "bargain behind" between Henry Bullitt and Col. Bullitt, the exercise of the power by Henry Bullitt was fraudulent or not, because of the conditions which he annexed to his appointment. Although the word "fraudulent" is the one usually used in the opinions upon this point, yet it is not employed in any vicious sense, but to express, as these opinions say, the idea of fraud "only in the technical sense . . . being made for a purpose and solely for a purpose foreign to the power." See In re Cohen, (1911) 1 L. R. page 37. Sugden in his classic work on Powers (3d. Am. Ed.) second volume, at page 50, says:

"There are three modes in which a power may be exceeded. First, in the objects, as where a power to appoint to children or nephews is exercised in favor of grandchildren or great-nephews. Secondly, in the interests given, as where under a power of leasing for 21 years a lease is granted for 22 years. Thirdly, in condition annexed to the gift, as where the fund is given on condition that the appointee pay a particular debt."

It is with the third class of this division that we are particularly interested. Sugden begins his discussion of this class with these observations:

"Where conditions are annexed to the gift not authorized by the power, the gift is good and the condition only is void so that the appointee takes the fund absolutely. As if an appointment should be made and a condition annexed to it that the appointee shall release a debt owing to him or pay money over, the appointment would be absolute and the condition only would be void because the boundaries between the excess and proper execution are precise and apparent."

The foregoing is taken almost literally from the case of Alexander v. Alexander, 2 Ves. Sr. 640, 28 Eng. Rep. 408, which did not involve this question at all. There a donee of a power was authorized to exercise it among the five children of the donor. The donee appointed one share to the donor's son and his wife and children free from the claims of the creditors of such son. The court held that the son's wife and children were not objects of the power; that the donee never intended that this part so appointed should lapse into the residue; and that the son alone took the whole share. Sugden himself admits that this decision is not satisfactory and is subject to question. Sugden on Powers (3d Ed.) p. 59. In the case of In re Kerr's Trust, 4 Ch. Div. 600, the facts were that M held a power to appoint among her children. In default of appointment, the property was to be equally divided among the children. She appointed one moiety to C, a legitimate child, and the other moiety to E, an illegitimate child. It was held that, as E was not an object of the power, the appointment as to E fell and such moiety was divisible among all the legitimate children as in default of appointment. In the course of the colloquy between the court and counsel, Sir George Jessel, master of the rolls, said:

"Alexander v. Alexander is not quite in point. There were various questions in that case, but the actual decision was that under the particular circumstances, the son was entitled to the whole of the appointed fund. Sir Thomas Clarke read the will as if the words were, 'To my son, Francis, and his wife and children, if they shall by law be capable.' In saying that the reasoning was 'very artificial' and 'not satisfactory,' Lord St. Leonards means to say it was unsound reasoning, and I agree with him. The master of the rolls had no right to put into the will the words he did. The decision in effect was, that although there was no possibility of ascertaining what shares the appointees were intended to take, yet the one object of the power took the whole. That decision has been overruled by later authorities."

Thus we see that the language in the Alexander case which Sugden followed was dictum and that the Alexander case itself upon the point decided has been overruled. To what extent has this dictum been literally fol-

lowed by the later decisions? The learned chancellor who tried this case in the lower court said:

> "It must be admitted, I think, that if the donee of a special power to appoint by will could without an antecedent bargain, but by the terms of the appointment itself, effectually impose upon the appointee an obligation to pay the donee's debts or to confer some benefit upon persons not objects of the power, this would be as objectionable as an appointment made is accordance with a bargain. It would not have so ugly a look as a bargain beforehand and certainly would exculpate the appointee, but it would just as effectually defeat the donor's intention. It was possible, therefore, that the law in its slow evolution through court decisions would take the course of declaring such execution void. But it did not take that course. The courts said . . . the gift is good; the condition is bad."

Have the courts in all cases held the gift good, but the condition bad? If in some they have while in others they have held the gift invalid, what has been the distinguishing feature which called for the differing decisions? An analysis of some of the leading cases may give us the clue. In Saddler v. Pratt, 6 Sim. 632, the facts were that, under a power of appointment to the children of her first marriage, the donee undertook to appoint to all her children, those by a subsequent marriage as well as those by the first marriage. She provided that, if any child by the first marriage should object, she should have nothing, and, if all objected, the property should go to the youngest child by the first marriage. It was held that the appointments to the children by the first marriage were good, but to those of the subsequent marriage bad; that the conditions were void and to the extent of the attempted appointment to those not objects of the power, the property went as if in default of appointment. The result, in this case, was that all the children of the first marriage got all the property just the same as if no appointment at all had been made or as if the appointment which was made had been declared wholly void.

In Dillon v. Dillon, 1 Ball & B. 77, the donee of a power to appoint unconditionally appointed with the condition that the portions be paid at the age of 21 or day

of marriage. The appointment was held good but the condition bad.

In Roberts v. Dixall, 2 Eq. Cas. Abr. 668, the donee of a power to appoint his wife's estate to their younger children gave the only child £3,000 which he declared should be in satisfaction of £1,000 charged on his own estate in favor of this child. Lord Hardwicke held that the attempt of the donee to satisfy the charge on his own estate in this fashion was ineffectual. He did not uphold the whole appointment, though. On the contrary, he held that since there was a plain intention to give the daughter only £3,000, £2,000 should be raised from the mother's estate and £1,000 from that of the father. It will be noted that the *donee's intention* was a very material consideration in this case.

In Hewitt v. Lord Dacre, 2 Keen, 622, 48 Eng. Rep. 768, a testator gave his wife the power of appointment among six children, and, in default of such appointment or any part thereof, equally among his children. The wife undertook to appoint one-sixth of the estate to each of three sons-in-law (which because of their marital rights, was within the power and the appointment the same as though made to her daughters) charged with the debts of her sons-in-law to her estate. Lord Langdele, the master of the rolls, held the appointments good, but the condition bad.

In Robinson v. Hardcastle, 2 Term R. 241, 100 Eng. Rep. 131, Mr. Justice Buller, by way of dicta, said that an execution of a power charged with the payment of the donee's debts was perhaps wholly void because of the condition annexed to the execution of the power. Sugden in his book, supra, pages 77, 78, criticizes this dicta, and yet in the next paragraph cites the case of Hay v. Watkins, cited by him as 3 Bro. & War. 339, but which we have found in 3 Dru. & War. 339, and which he, as Lord Chancellor, decided. There the donee of a power to appoint among his children appointed the sum of £200 to his daughter Harriett "to have me properly buried in this island and to pay what small debts I may owe in this island at my decease." In holding this appointment bad, the Lord Chancellor said:

> "The object of the gift was not a mere bounty to the testator's daughter, but a something more, a payment of the testator's small debts. The cases go to this extent: That where the intention to benefit

the object of the power is clear, and that something is superadded, a condition annexed to the gift not warranted by the power, there the gift is good; the court will strike out what is excessive, and the appointee will take the fund absolutely; but, in this case, the benefit was intended to be given to the daughter, upon condition of her complying with the terms, which the donee of the power imposed, namely, the having him properly buried, and paying what small debts he might owe at his decease. Can it be argued, that it was intended that this lady was to take this sum of £200 and comply with neither of the conditions? That, however, may be said of every such case; but, still further, where it is difficult to separate the gift from the condition, they constitute an entire gift. The words are, 'I bequeath unto my daughter Harriett a further sum of £200, to have me properly buried in this island, and to pay what small debts I may owe in this island at my decease.' It is like the case of a legacy, where there is no gift except in the direction to pay. I cannot separate the gift from the condition, and therefore must hold the appointment to be bad. I believe this to be the soundest construction, although I do not think the case free from difficulty. I allow the exceptions.''

Again, does the donee's intention play an important part in the result reached.

One of the most famous of English cases, that of Lady Mary E. Topham, which reached the courts on numerous occasions, grew out of the effort of the family of Lady Topham to control her marriage. She was the daughter of the Duke of Portland. She had a sister, Harriett, and a brother who succeeded to the title after the death of their father. The family endeavored to prevent the marriage of Lady Mary to the man of her choice, and, after her marriage, possibly to force her to leave him. It may be said in passing that the family was unsuccessful in its efforts. By his will, their father, the Duke of Portland, created a fund with power in his son (S), later Duke of Portland, to appoint it to either of his sisters, Lady Harriett (H) or Lady Mary (M), or to both, on such terms as he saw fit, and in default of and until appointment to both H and M equally. After the marriage of M, contrary to the wishes of the family, S by a revocable power appointed to H, but there was an

understanding that she was to accumulate a moiety of the appointed estate for M to be given her as they might afterwards determine. It was held (Duke of Portland v. Lady Mary E. Topham, 11 H. C. L. 32, 11 Eng. Reprint, 1242) that the appointment was bad as a fraudulent execution of the power. This decision might properly fall under the "bargain behind" classification. But in its course, Sugden, then Lord St. Leonards, said:

"A party having a power like this must fairly and honestly execute it without having any ulterior object to be accomplished. He cannot carry into execution any indirect object or acquire any benefit for himself directly or indirectly. It may be subject to limitations and directions, but it must be a pure, straightforward, honest dedication of the property as property to the person whom he affects or attempts to give it in that character."

After the court had held the appointment made by S bad in the above-styled case, S appointed outright to H. Again did M attack the appointment. The court examined the evidence and found that, although there was no understanding or agreement between H and S to accumulate any part of the fund for M, yet H felt under a moral obligation to do so, and was in fact accumulating the moiety for M to be paid her as events or circumstances might thereafter dictate. Again, was the appointment held void. Topham v. Duke of Portland, L. R. 5 Ch. App. 40. In this case, Lord Hatherley said:

"I think that Lord Justice Turner has clearly and with his usual accuracy pointed out the true distinction between motive and intention. The court cannot inquire into the motive, but can inquire into the intention and purpose, and this is indeed the point on which I conceive our decision of the present case must turn. If the Duke truly preferred Lady Harriett, either on the ground of her sister's supposed disobedience to her father's wishes in her marriage, or for any other reason, however capricious, intended simply to give the property to her in preference to her sister, he is by the power authorized to do so. If he, on the contrary, has not any such intention, but has executed the instrument with the intent that Lady Harriett having the sole control of the fund should abstain from dealing with it as

her own and should accumulate one moiety of it in order according to events either to dispose of it for her sister's benefit or to let it fall back according to the limitations in default of appointment, then I think the distinction taken by Lord Turner between intent and motive would apply. . . . But the existence of the intent on the part of the appointor as evidenced by the communication to the appointee after the appointment has been made of a purpose inconsistent with the power was in Re Marsden's Trusts, 4 Drew, 594, held sufficient to vitiate the appointment though the appointee had not before the appointment been privy to the arrangement."

Do we not find the solution to the seeming conflict between the cases in these excerpts from the Hay v. Watkins and Topham cases? While it is true that the courts will not inquire into the motive which actuated the donee of a power in its exercise, yet they will inquire into the intention of the donee in such exercise; and while it may be that, if the intention of the donee of the power is that the beneficiary to whom he appoints and who falls within the class of beneficiaries designated by the donor of the power should receive the benefits of the appointment, even at the expense of the failure of the conditions which he has annexed to the appointment, then the appointment will stand, but the conditions will fall because under such circumstances the donee of the power is really carrying out, as the quasi trustee that he is, the wishes of the donor, yet, if it is plain that the intention of the donee in the exercise of the power is not to benefit the appointee unless and except benefit to himself or to some one not an object of the power result, then the appointment itself is bad. Thus in the case of In re Cohen, (1911) L. R., 1 Ch. 37, the donee of a special power to appoint his share under his father's will to his wife and children appointed in the exercise of the power an annuity of £1,200 to his wife. He further provided that, in case his residuary estate should be insufficient to pay his just debts, the trustees of his father's will should pay to his wife an additional annuity of £500 so long as any of his debts should remain unpaid or for a period of 10 years from his death, whichever should be the shorter period, on condition that and so long as she should expend the sum of £400 in every year in the payment of his debts, and after the debts should have been fully paid by her

or after the expiration of 10 years from his death, whichever should be the shorter period, to pay to her if she should have fulfilled the condition instead of the additional annuity of £500 an additional annuity of £100 for the remainder of her life. The court held that the appointment of £500 a year to the wife was not made with the intention to benefit the object of the power, but for the purpose of effecting an object which was not authorized by the power, and that, as the appointment would never have been made except for the expectation and with the intention that this purpose should be fulfilled— that is, the payment of the appointor's debts—the appointment was bad. The court said:

"There is no doubt that, where an appointment is made for the benefit of the appointor, that appointment may be a fraud upon or an abuse of the power, even though there may have been no bargain between the appointor and appointee and no previous communication to the appointee of any intention that the appointee should apply the appointed fund in any way at variance with the terms or objects of the power."

In the case of D'Abbadie v. Bizoin, I. R. 5 Equity, 205, the donee of the power made an appointment to one of the objects of the power on the condition that the appointee should decide to reside in France, and, in the event he should decline so to do, then over. It was there held that the intention was not to benefit the appointee, but to effect a purpose foreign to that of the power, for which reason the appointment was void. The case of In re Wright, (1920) L. R., 1 Ch. 108, probably falls under the classification of a bargain behind; but in that case the court said:

"What the court looks to is the intention or purpose of the appointor in making the appointment, and, if it can be shown that the intention or purpose of the appointor was such that if it were carried out it would operate as a fraud on the donor of the power in the sense of benefiting some person not an object of the power, the court will avoid the appointment, though the appointee was no party to and did not know of the corrupt intention or purpose, and although the corrupt intention or purpose in fact fails to take effect."

This matter of intention or purpose is probably the key to the cryptic phrase used in Sugden and repeated in the cases of "the boundaries between the excess and execution," they saying that, where they are not distinguishable, the execution is bad, but, if they are "precise and apparent," the execution is good and the excess bad. Without a further elaboration of the authorities on the precise queston before us, those from other jurisdictions in this country being but very few in number and there being none from this jurisdiction, we are convinced that the correct rule as gathered from the cases and as good conscience dictates is that, if it is plain that the intention of the donee in the exercise of the power is not to benefit the appointee unless and except benefit to himself or to some one not an object of the power result, then the appointment is fraudulent and bad. Applying this principle to the facts of this case, we find that, by the original will of Henry M. Bullitt, it was expressly provided that, if Thomas Bullitt did not care to accept the conditions annexed to the appointment, he should not have the appointed estate, but that it should go as in default of appointment. The will required Col. Thomas Bullitt to express his assent to the conditions by a writing to be recorded when the will was probated. It is plain that the purpose of Henry M. Bullitt was, first, that such debts as he left should be paid by his brother and appointee, Col. Thomas Bullitt, and, secondly, that a provision for his wife should be made. If this purpose was effected he was willing for his brother to take the estate, but, if this could not be effected, then he was not willing for his brother to do so. This being true, we think the case plainly falls in the line of cases illustrated by In re Cohen rather than in that of those where the court consciously or otherwise spelled out a purpose on the part of the donee to benefit the object of the power, even though the conditions coupled to the exercise of the power fell. We are, therefore, of opinion that in the language of the Cohen case the execution of the power by Henry M. Bullitt "was fraudulent and void, fraudulent only in the technical sense, of course, being made for a purpose foreign to the power."

Having reached this conclusion, we are next confronted with the proposition whether or not the appellants are barred by the 5, 10 or 15 year statute of limitations (Ky. Stats., secs. 2515, 2519, 2505). First, with regard to the 15-year statute:

The appellees' position on this branch of the case is based upon the fundamental proposition that Mrs. Henry Bullitt had no life estate in the land and that her occupancy of it from the death of her husband until her own decease was as a tenant by will or sufferance of Col. Thomas Bullitt. If this be the case, then they argue that, her possession being that of Col. Bullitt, and he holding that possession during these more than 15 years adverse to the claims of the appellants herein, such possession has ripened into title. To sustain this position, appellees say that the devise to Mrs. Bullitt for life found in the will of Wm. C. Bullitt was void because it violated section 2360 of the Kentucky Statutes. That section reads:

"The absolute power of alienation shall not be suspended, by any limitation or condition whatever, for a longer period than during the continuance of a life or lives in being at the creation of the estate, and twenty-one years and ten months thereafter."

Whether this statute is merely declaratory of the common-law rule against perpetuities as said in Coleman v. Coleman, 65 S. W. 832, 23 Ky. Law Rep. 1476; Cammack v. Allen, 199 Ky. 268, 250 S. W. 963, and Fidelity & Columbia Trust Co. v. Tiffany, 202 Ky. 618, 260 S. W. 357, or is meant to deal with inalienable interests as said in Perry v. Metcalfe, 216 Ky. 755, 288 S. W. 694, and Carter's Trustee v. Gettys, 138 Ky. 842, 129 S. W. 308 (see, also, Kentucky Statutes against Perpetuities, 16 Ky. Law Journal, 97), the result reached on the question in issue in this case must be the same. The common-law rule deals with contingent interests. If the interest vests within the time prescribed by the rule, it is not obnoxious to the rule, although it may end beyond such time. Gray on Perpetuities (2d Ed.) par. 232. In the present case, the devise under which Mrs. Bullitt claimed a life estate was a devise by Wm. C. Bullitt to his widow for life, remainder to Henry Bullitt and his then wife, for their joint lives, remainder to the survivor for life, remainder in fee to Henry's descendants, or failing these to the testator's heirs. It is clear that the limitations after the last life estate are too remote. It is possibilities and not probabilities with which the rule deals. Mrs. Henry Bullitt, who was living when Wm. C. Bullitt died, might herself have died during the lifetime of Mrs. Wm. C. Bullitt.

Though not probable it was yet possible for a girl child to be born after the death of Wm. C. Bullitt and during the life of his widow, and for this child to grow up and marry Henry Bullitt, during the life of Wm. Bullitt's widow, all after the death of the Mrs. Henry Bullitt, who was living at the time of the death of Wm. C. Bullitt. Under these possibilities this girl who was born after the death of Wm. C. Bullitt and had grown up and married Henry Bullitt during the lifetime of Mrs. Wm. C. Bullit would on the latter's death have been Henry's *then* wife and would thus have been the devisee named by Wm. C. Bullitt's will. Upon Henry's death all of the lives in being at the time of Wm. C. Bullitt's death would have expired and since the second Mrs. Henry Bullitt, born, under our supposition, after the death of Wm. C. Bullitt, might live more than 21 years and 10 months after the death of Henry Bullitt, it follows that the limitations following her life estate, being contingent in their inception, and not vesting within the time prescribed by the rule, were too remote. Now, the limitations beyond Mrs. Henry Bullitt's life estate being void, was her life estate itself void? As stated, it vested in time and was not void under the rule. It is true it might continue beyond the period prescribed by the rule; but, as it vested in time, it was not alone on that account, as we have seen, invalid. Did the fact that the ultimate remainders were invalid, as being against the rule, render Mrs. Bullitt's life estate invalid? As to this, the chancellor said:

"Upon principle, there would seem to be no reason why the invalidity of ultimate or penultimate limitations should affect an antecedent estate which is good in itself. A devise to one for life, without more, is good; the reversion is in the devisor's heirs. Whatever may be the rule in other jurisdictions it is not the rule in this state that the whole devise is bad when its ultimate limitations are bad. Carter's Trustee v. Gettys, 138 Ky. 842, 129 S. W. 308; Tyler v. Fidelity & Columbia Trust Co., 158 Ky. 280, 164 S. W. 939; Brown v. Columbia Finance & Trust Co., 123 Ky. 775, 97 S. W. 421, 30 Ky. Law Rep. 110; Lindner v. Ehrich, 147 Ky. 85, 143 S. W. 778.

"It is true that, in these cases, the life estates which were sustained despite the invalidity of subsequent limitations were to persons in being at the

testator's death. No Kentucky case has been found in which a life estate to an after-born person, which must necessarily vest in time (as was the case under Wm. C. Bullitt's will), has been sustained despite the invalidity of subsequent limitations. Nor is there any case in which it is clearly decided that such a life estate must fail with the subsequent invalid limitations.

"There are, at least, six Kentucky cases in which ultimate limitations, preceded by life estates to after-born persons, were held void. Brown v. Columbia Finance & Trust Co., 123 Ky. 775, 97 S. W. 421, 30 Ky. Law Rep. 110; Lindner v. Ehrich, supra; Tyler v. Fidelity & Columbia Trust Co., supra; Curd's Trustee v. Curd, 163 Ky. 472, 173 S. W. 1148; Brumley v. Brumley, 89 S. W. 182, 28 Ky. Law Rep. 231; U. S. Fidelity & Guaranty Co. v. Douglas' Trustee, 134 Ky. 374, 120 S. W. 328, 20 Ann. Cas. 993.

"But in each of those cases the life tenant whose estate immediately preceded the void limitation was the very person to whom the fee went by reason of the elimination of the void limitation; so that it can hardly be said that there was a decision that the life estate itself was void. It was merged in the absolute interest to which its holder had succeeded. In some of these cases the fee came to the life tenant by descent from the testator; in some (as in the Douglas case) it came to him by virtue of some other provision of the will, in accord with the rule laid down by Prof. Gray, Perpetuities (2d Ed.) par. 233:

" 'When there is a good absolute gift, and the settlor or testator goes on in a second clause to modify the gift by directing that the donee shall have a particular estate, with a limitation over to his issue, children, etc., and this latter limitation is bad for remoteness, the whole modifying clause is disregarded, and the donee takes the absolute interest.'

"In Beall v. Wilson, 146 Ky. 646, 143 S. W. 55, the point was not decided, but in discussing the question of perpetuities the court quoted with approval a passage from Washburn's Real Property, in which the author says that the effect of the invalidity of a limitation is that the first taker 'holds his estate dis-

charged of the condition or limitation over; if this be in turn for life, he has a life estate,' etc. And in Johnson's Trustee v. Johnson, 79 S. W. 293, 25 Ky. Law Rep. 2119, the court expressly rejected the claim that the whole devise was bad because the statute had been violated, saying that the rule is that 'that which is good, if severable from the bad, will be allowed to stand.'

"As to the cases cited from other jurisdictions, those from Illinois resemble the Kentucky cases mentioned above, in which the fee devolved upon the life tenant and absorbed the life estate which preceded the void limitation. Most of these foreign cases involved elaborate trusts designed to effectuate an intricate scheme of benefits and it was held that the good could not be separated from the bad without, in effect making a new will for the testator. The Missouri cases are the strongest for the invalidity of the whole devise and are based upon something said by Sir William Grant in Leake v. Robinson, 2 Mer. 363, which would appear to have been misunderstood or misapplied, since that case is repeatedly discussed, without dissent, by Prof. Gray, Perpetuities, secs. 343, 373, 375, 382, 385, who himself says that 'an estate can be limited to an unborn person for life, whether there be a gift over or not' (section 232), and adds that the English and American authorities are to the same effect, that an estate for life, or a term for years, if beginning in time, is good, 'although followed by a limitation bad for remoteness.' In Hewitt v. Green, 77 N. J. Eq. 345, 77 A. 25, the anterior interests (annuities) which were separable were allowed to stand, despite the invalidity of the ultimate limitations.

"I think that the devise to Mrs. Bullitt for life was not defeated merely because the subsequent limitations were bad."

In this we concur.

On the other hand, if our statute is meant to deal with inalienable interests and is aimed at the suspension of the power of alienation beyond the prescribed time, does the existence of a life estate in Mrs. Henry Bullitt suspend the power to convey the absolute interest as denounced by the statute as thus interpreted? In other

words, it requiring the concurrence of two or more persons to alienate absolutely the property, is the statute violated? The case of Bowling v. Grace, 219 Ky. 496, 293 S. W. 964, is an answer to this question. That case in effect holds that, where the property may be alienated absolutely within the prescribed time, though requiring the concurrence of two or more persons, the statute is not violated. The appellees further insist, however, that even though Mrs. Henry Bullitt's life estate was not invalid under section 2360 of the Statutes, yet Mrs. Bullitt surrendered that life estate to Col. Thomas Bullitt, first, by voluntarily acknowledging the justice of the claim of Col. Bullitt to hold the land adversely to any right she might have had as the life tenant under the will of Wm. C. Bullitt, and, secondly, by the renunciation she made of her husband's will. As to the first of these contentions, the chancellor said:

"There are several items of evidence which are supposed to show that Col. Bullitt claimed the land adversely to any right of Mrs. Bullitt as life tenant and that Mrs. Bullitt acknowledged the justice of the claim. One is that he insured the improvements against loss by fire; but as the policy was made payable to himself and Mrs. Bullitt, as their interests might appear, it cannot be said to be very persuasive. A second item is that Mrs. Bullitt endeavored to induce her brother-in-law to allow her the use of the land; but the evidence shows that she probably asked this as of right and not as of grace. A third item is that Mrs. Bullitt, instead of disclaiming the provision made for her by her husband's will, renounced his will and claimed dower, which the trustee insists involved a recognition of Col. Bullitt's 'ownership and possession.' This is an inference from a somewhat intricate theory of the legal consequences of renunciation by a widow of her husband's will, as contrasted with the consequences of disclaimer of its provision for her. That theory will be examined in discussing the plea of limitation, of which it is an essential ingredient. It finds a place in this narrative merely as a claimed, actual acknowledgment by Mrs. Bullitt of her brother-in-law's title to and possession of the land.

"It is also claimed that, after Henry Bullitt's death, his tenant, Westerman, who had occupied the

land since 1898 and continued to occupy it until about a month before Mrs. Henry Bullitt's death in 1924, attorned to Col. Bullitt. If Westerman bothered his head at all about his legal status, he must have been somewhat puzzled. Henry Bullitt, shortly before his death, had told him to see Col. Bullitt about renewing his lease. Col. Bullitt, a month or two later and after Henry's death, referred him to Mrs. Bullitt. Mrs. Bullitt raised his rent and collected it during the ensuing 15 years or more, but referred him to Col. Bullitt for reimbursement for improvements made by him at Henry Bullitt's direction. Westerman's testimony will be considered in connection with the plea of limitation, to which it belongs; but, upon the whole it must have seemed to him, if he thought about it at all, that his allegiance went, with the rent, to Mrs. Bullitt.''

We concur with the chancellor in the finding that the evidence fails to show that Mrs. Bullitt surrendered her life estate to Col. Bullitt by voluntarily acknowledging the justice of his claim to hold the land adversely to her life estate. As to the second contention, that Mrs. Bullitt surrendered her life estate by renouncing her husband's will, the chancellor said:

''The claim that Mrs. Bullitt surrendered her rights, whatever they were, under Wm. C. Bullitt's will by renouncing her husband's will and claiming dower, is a novel one. The argument is that the limitations of Wm. C. Bullitt's will beyond the life estate to Henry Bullitt were invalid (because violative of section 2360 of the Statutes); that, consequently, upon Wm. C. Bullitt's death the reversion was in his heirs, subject to be defeated by a valid exercise of the power given to Henry; that Henry, as one of those heirs, took an undivided one-sixth interest in the land; that this was the whole of his estate at his death; that Mrs. Bullitt, when she renounced her husband's will, claimed dower in that undivided, one-sixth interest, since there was nothing else to which the claim could attach; that this was necessarily an election on her part to relinquish the inconsistent claim of a life estate in the whole land, and, consequently, that in applying to Col. Bullitt for the use of the land she must necessarily have recognized his

right under the appointment, since it was only the appointment that could give him any right to grant her request.

"The reason which is supposed to have induced Mrs. Bullitt to make an election apparently so disadvantageous to her is that she had been advised that her father-in-law's devise to her was invalid and that her only prospect was dower, unless her appeal to her brother-in-law's generosity was successful.

"It will be noticed that this argument involves the remarkable doctrine that a widow's renunciation of her husband's will involves a 'recognition' of that will and precludes the assertion of any right or title inconsistent with dispositions made by the will, save only the statutory right of dower and distribution. The doctrine is even pushed to this extreme: That, if a woman renounces her husband's will, she cannot claim her own property which her husband has undertaken to devise to another but by the renunciation has 'recognized' and acquiesced in the spoliation of which she is the victim. It is said that, if she would retain her own property, she must not renounce (under section 1404, Ky. Stats.), but disclaim (under section 2067, Ky. Stats.), in which last event she may have what is her own, but at the price of forfeiting, not only what may have been given her by the will, but also her dower and distributable share. It would follow from this that a man could cut off his wife from all participation in his estate by the simple expedient of devising or bequeathing her fortune to others.

"There is no authority for this revolutionary doctrine; nor is there anything in the statute which countenances the distinction attempted to be made between the effect of renunciation and the effect of disclaimer. Mrs. Bullitt, upon her renunciation of her husband's will, was entitled not only to claim dower, but to assert any rights she had under Wm. C. Bullitt's will, no matter if the assertion of those rights should defeat some attempted disposition of her husband's will."

In this we concur.

This disposes of the appellee's defense of the 15-year statute of limitations and brings us to a consideration of their plea of the 5 and 10 year statutes. As to this, they

argue that the appellants' cause of action is grounded on fraud, for which reason they must have brought their suit within 5 years after the discovery of the fraud and at all events 10 years after the perpetration of the fraud, and that, as Henry M. Bullitt's will was probated in October, 1908, and this suit was not brought until June, 1925, the appellants are barred by the statutes mentioned. On the other hand, the appellants argue that, as they were remaindermen or reversioners, they did not have to bring their suit for a sale of the land and a division of the proceeds until the intervening life estate had expired. In this they are correct, if the attempted exercise of the power of appointment by Henry M. Bullitt was void. In that state of case their action is essentially one for a sale of the property and a division of the proceeds. If this be true, limitations did not begin to run against them until such time as they had a right to demand possession, which time did not accrue until the expiration of the life estate. Duncan v. King's Adm'r, 163 Ky. 577, 174 S. W. 34. Indeed, the appellees do not question the soundness of this conclusion if the premise on which it is founded be itself sound. They say, however, that the appointment by Henry M. Bullitt was not void, but only voidable; that it was voidable because of fraud; that, before the appellants can obtain the relief of a sale of the land and a division of its proceeds, they have to avoid this voidable appointment; and that, where a reversioner or a remainderman in order to establish his title must first set aside as fraudulent a previous judgment or deed or will or other instrument, the cause of action accrues and the statute of limitations begins to run, not from the death of the life tenant, but from the date of the perpetration of the alleged fraud. To sustain this position, appellees cite Kellar v. Stanley, 86 Ky. 240, 5 S. W. 477, 9 Ky. Law Rep. 388, and Francis v. Wood, 81 Ky. 16, and undertake to distinguish Burt & Brabb Lumber Co. v. Bailey, 60 S. W. 485, 22 Ky. Law Rep. 1264, Sewell v. Nelson, 113 Ky. 171, 67 S. W. 985, 23 Ky. Law Rep. 2438, and Huff v. Byers, 209 Ky. 375, 272 S. W. 897. It will not be necessary to go into the question of the correctness of the appellees' position if their premise that Henry Bullitt's appointment was voidable be sound, for we are of opinion that this appointment was not voidable, but void. In the first place, we have yet to read a case involving the question of a "fraud upon the power"

where the court in setting aside the appointment has not used the expression that the appointment was void. The text-writers make use of the same expression. This the appellees admit in their brief, but say "this is loose writing." But is it? Justice Holmes, in his illuminating writings on our law, has remarked time and again upon the confusion caused in our law by inaptness of statement and by the use of words which do not convey precisely the meaning intended. Such is the use of the word "fraud" in this matter of "fraud upon powers." The appointment is held bad by the courts where a fraud upon the power is discovered, not because of the presence of any bad faith, dishonesty, overreaching, or any of those elements which one usually associates with the idea of fraud, but because the appointment has been made in excess of the power conferred. Bigelow in his work The Law of Fraud, at page 12, says:

"Another term is 'fraud upon powers.' The donee of a power ought to exercise the same only in conformity with its terms; e. g., not for his own bene- fit, except in so far as a just interpretation of the power may permit. If, contrary to duty, he should exercise the right for his own benefit, it would be said that he had committed a 'fraud upon the power.' But there might be no fraud—generally there would be none—properly speaking, in the act; it would have been quite as accurate from the beginning to say that the donee has abused the power. But such offenses may properly be considered as falling under the head of constructive fraud. A like remark may be made of many cases of breaches of trust. Fraud is often predicated of them in a loose sense. When, there- fore, such cases are treated under the head of fraud, as must often be necessary, the nature of the miscon- duct should be considered, so as to distinguish the case, if necessary, from cases of true fraud, and so to avoid confusion."

In Re Marsden's Trusts, supra, the court said:

"I am satisfied that this case comes within what is called 'a fraud upon the power,' not imputing any bad object to the parties, but clearly contrary to the power."

In Re Cohen (Brookes v. Cohen), supra, the court said:

"Therefore I consider that this case comes within the proposition . . . that the execution was fraudulent and void—fraudulent only in a technical sense, of course—being for a purpose and solely for. the purpose foreign to the power."

In Shank v. Dewitt, 44 Ohio St. 237, 6 N. E. 255, the court said:

"If, in the attempted execution of the power conferred upon her, she sought and obtained a substantial pecuniary benefit for herself, beyond and not contemplated by the manifest intention of the testator, the appointments fail as inoperative and void for want of power to make them."

And in our own case of Degman v. Degman, supra, we said:

"That Mrs. Sweet should desire that her debts be paid and her husband taken care of was natural and commendable, yet she had no power to so apply or use the trust property."

It is thus clear that the use of the word "void" by the courts and text-writers is not loose writing, but an accurate expression designating the result of an attempt to perform an act which the performer has no authority to perform. The appointment is bad because the donee of the power has no right or authority to so appoint, and his attempted appointment is beyond the scope of his right or authority. He has gone beyond that which the donor of the power authorized him to do, and those who stand in the shoes of the donor on default of appointment take under such circumstances, because the attempted appointment is void, being beyond the terms of the power. It follows, then, that, the appointment being void, the appellants were not barred, as we have seen, by the 5 or 10 year statute of limitations.

This brings us to a consideration of the last defense interposed by appellees; that being the claim for improvements put upon the property. Appellants' contention that appellees have illy pleaded this defense is sound, for appellees claim the value of the improvements put upon the property and not the increase in its vendible value by reason of the improvements. It is only the

latter which appellees are entitled to claim if they have any claim at all. Hurt's Guardian et al. v. Crawford Coal Corp., 222 Ky. 504, 1 S. W. (2d) 955. The chancellor, dismissing appellants' petition on other grounds, did not go into this question. The proof shows that there are many items which very clearly did not enhance the vendible value of the property, such as sums spent for mules and tractors and farm machinery. On the other hand, there are some items which may have increased such value, such as sums spent for fencing and rebuilding outbuildings. However, the record is in such shape that we cannot definitely say how much the vendible value of the property has been increased, if at all, by these improvements. As the case must be reversed and as the sale of the land must be had, we have concluded to allow the parties to take more proof on this issue of enhancement of vendible value. It is true appellants urge that appellees are not entitled to any such enhancement because charged with notice of their lack of claim to the property, but as pointed out in the Crawford Coal Corp. case, supra, the courts are emphasizing more and more in this matter the question of good faith on the part of the party improving the property. The evidence shows that, at the time the improvements were put on this property, Mrs. Annie Bullitt believed in the best of faith that she was the owner of it. The length of this opinion and the troublesome questions disposed of by it demonstrate that she was not entirely without basis for her belief in her ownership. The defect in her title could have been discovered only by a skillful lawyer or one imbued with far more intuition than is the ordinary layman. Such being the case, under the rule of the Crawford Coal Corp. case, supra, and the cases therein cited, Mrs. Annie Bullitt was a bona fide holder entitled to any enhancement in vendible value by reason of improvements made by her or her trustee who stands in her shoes.

Other questions are presented by the appellees, such as laches which is not supported by the record, and an estoppel against James S. Chenoweth which was not pleaded, and hence cannot be considered. Hughes v. Eison, 190 Ky. 661, 228 S. W. 676. We need consider these no further as they are without merit.

The judgment of the lower court is reversed, with instructions to enter a judgment in conformity with the prayer of the petition, but with leave to the parties to

take further proof on the question as to how far the improvements put upon the land in question by the appellees increased, if they did increase, the vendible value of the land, the appellees to have a lien on the property for such increase, if any, and for further proceedings not inconsistent with this opinion.

Whole court sitting.