## St. Matthews Bank v. De Charette et al.

(Decided June 4, 1935.)

J. H. GOLD for appellant.

RICHARD PRIEST DIETZMAN, GILBERT & DAVIS and C. G. BARRICKMAN for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The issues to be decided on this appeal are: (1) Whether a power of testamentary appointment is special or general: (2) if general, whether this court should hold, as do the majority of courts, that the act of executing a general power ipso facto requires a court of equity to seize the property and subject it to the payment of the debts of the donee if his estate is insufficient and thereby deprive the appointee of his bounty.

The codicil of Mrs. Betty Meriwether which forms the basis of this litigation is copied in full in De Charette v. St. Matthews Bank & Trust Co., 214 Ky. 400, 283 S. W. 410, 50 A. L. R. 34. As considered in that opinion, and in De Charette's Guardian v. Bank of Shelbyville, 218 Ky. 691, 291 S. W. 1054, the will devised to the testatrix's daughter, Mrs. Sue T. Henning, a farm called "Allendale" for her life, with a power of disposition by will. Mrs. Henning died in 1933. Prefacing the disposal of this farm with the express declaration that it was in the exercise of the power given by the will of her mother, Mrs. Henning devised it to her daughter, Suzanne De Charette, in trust for her life, with remainder to her issue in such proportions as she might by her will devise, but in the absence of such a will, then to her issue per stirpes. By a codicil made for the declared purpose of compensating Warren T. Godfroy and Matt J. Holt for their services as her attorneys, Mrs. Henning devised to them an undivided remainder interest in "Allendale" farm equal in value to $6,000. A later codicil, referring again to the power given by her mother's will, and stating that she had not been able to pay her attorneys any fee for their additional services, rendered in the second-styled case and otherwise, she devised them a remainder interest in the

farm equal in value to $12,000. This suit in which the several appointees of the power, including the infant daughter of Suzanne De Charette, and a great number of Mrs. Henning's creditors are parties, seeks a construction of Mrs. Meriwether's will and a declaration of rights in relation to the disposition of the farm as made by Mrs. Henning.

It was adjudged that Suzanne De Charette is the owner of a life estate in the property, with remainder over on her death to her issue; that under Mrs. Meriwether's will her daughter, Mrs. Henning, had only a special power of appointment by will and could only appoint to her issue; that the codicils devising the interest in remainder to Godfroy and Holt were ineffectual and void, in that she had undertaken to exercise the power in favor of those who were not within its object, and the further reason that its exercise in the manner attempted by the codicils was a fraud on the power. It was further adjudged that in no event did the attempted exercise of the power by Mrs. Henning inure to her general creditors so as to subject the farm to the payment of her debts to them. No question is being raised on appeal as to the construction of the will relating to the interest or rights of Mrs. De Charette under it.

. We are concerned with the codicil to Mrs. Meriwether's will dated November 14, 1911, by which she specifically revoked the seventh item of her will, dated August 1, 1906, and substituted the codicil for such original item. The only difference is that originally all of the testatrix's real estate was given in trust and subject to the same conditions, while by the codicil all real estate was given her in fee simple except "Allendale" farm, to which only was applied the original conditions and limitations. These were expressed in identical language.

1. The question first to be considered is whether there was a special or general power given Mrs. Henning by her mother's will. Where the donee is authorized to dispose of any estate or interest in property to whomsoever he pleases, including himself, it is a general power, while if the instrument creating it limits the purposes or objects, or restricts the exercise of the appointment to particular persons or class of persons or

to the estates or interests in the property, it is special power. The mode of execution does not affect the classification. Mandel v. Fidelity Trust Co., 128 Ky. 239, 107 S. W. 775, 32 Ky. Law Rep. 1104; Greenway v. White, 196 Ky. 745, 750, 246 S. W. 137, 32 A. L. R. 1385; Chenoweth v. Bullitt, 224 Ky. 698, 6 S. W. (2d) 1061; 21 R. C. L. 773.

After giving a life estate in the farm to her daughter in trust, with power to choose the trustees who should manage the property, Mrs. Meriwether added:

> "Provided, however, that the power to dispose of said real estate by will is hereby expressly granted unto my said daughter.

There is and can be no question that this was a general power of testamentary appointment. Continuing, the testatrix provided that if her daughter should desire to live on the farm, she should have its possession, control, and operation during such time as she did so. To make certain that this unrestricted use and management should not result in misinterpretation or an extension of authority, and to make clear her purpose that the farm should be retained unencumbered during her daughter's life, she added an explanation that she did not mean to give her the right to sell or encumber it in anyway. Emphasis is laid upon this clause as being such a limitation that the devisee could not dispose of the property in any way other than by her will to her children or the alternative beneficiaries named in the Meriwether will. We held in the former opinions that the farm was not subject to her debts, but that her life estate was. We cannot regard this limitation upon alienation as in any way restricting or affecting the general testamentary power theretofore explicitly given her.

The estate in remainder is thus disposed of, "Should my said daughter die leaving issue of her body living, upon her death the property so held in trust shall pass to her descendants; should my daughter die without leaving issue of her body living or descendants of such issue, said property" is devised to certain nephews and nieces or survivors. A subsequent codicil gave power to the daughter and trustee jointly to sell the farm for reinvestment in securities.

In ascertaining the intention of the testatrix, we

look to the familiar rule that effect must be given every part of her will, and, should there be doubt in apparently conflicting or inconsistent provisions, that construction is to be accepted as will harmonize the whole. While the disposition of the estate in remainder in the farm is not prefaced by any statement that it was to be effective only in case the daughter did not exercise the power expressly granted her, that is surely what was meant, and such is the harmonious reading of it. Nor do we think it can be said the disposition made of the estate in remainder in the alternative as to the beneficiaries was intended to nullify or qualify the expressed general power or confine the appointment to the descendants of the testatrix. Such a construction would effectually delete that part of the will or modify without justification the emphatic and clearly expressed grant to the daughter. In rewriting this important and principal item of her will in the codicil, the testatrix repeated the language, and later, in granting authority to her daughter and her trustees to sell the farm for reinvestment, she made no change in this explicit absolute power of appointment. With such affirmation, the court more surely should give it effect.

The entire instrument evidences confidence in the daughter, and doubtless the testatrix felt that she would care for her own blood in the disposition of the farm, but she did not so bind her. To say that she was confined to the designated remaindermen or other kindred would be to say that testatrix meant nothing by the power to devise. The inclusion of the broad provision, with its repetition, negatives such view. The harmonious conception of the will is that the devise of the estate in remainder was intended only in case the daughter failed to exercise the power.

In reaching this conclusion, we have not overlooked Morgan v. Halsey, Trustee, 97 Ky. 789, 791, 31 S. W. 866, 867, 17 Ky. Law Rep. 529, 36 L. R. A. 716, upon which those who contend that the present power is special, and not general, have confidently relied. The testatrix, Theodocia Strother, devised her residuary estate to her daughter, Sally Strother, a baroness residing in France, for her life, with remainder to her children, if any. In case she should die without issue, she was "invested with the power of disposing of the estate in any manner she may deem proper" by will.

It was further provided that should she die without issue and without having made such disposition, the estate should be divided among the brothers and sisters of testatrix. She declared her purpose in making disposition of her property to make her daughter independent and comfortable, and in the next place, if she should die without issue, to "leave her a memorial of my wishes as to its ultimate distribution unless circumstances should alter, of which she is to be the sole judge, not intending hereby to control her perfect freedom to do with it as she pleases at her death without issue." The donee undertook to give $60,000 of the estate to a trustee to build and endow a marble chapel and vault in Belgium as a tomb, and the balance for the erection of a home in Lexington, Ky., for certain children, old men and women in Kentucky, New Jersey, and Maryland. In measuring the power conferred by the Strother will, the court said:

> "It seems to us, looking at what was evidently a well-matured and cherished plan for disposing of her estate, Theodocia Strother never expected or intended it to be wholly diverted from her sister and two brothers, and devised by her daughter for two schemes, one of which serves only to show silly vanity, while feasibility of the other she manifestly did not, nor could, situated as she was, with reasonable certainty count on; indeed, it does not appear to be at all practicable.

> "But independent of the general plan of the will, and manifest affection and desire of the testatrix to provide for her sister and two brothers, it seems to us the language used, properly construed, shows that the exercise of the power of appointment by Sally Williams Strother was intended to depend upon a condition that did not exist at the time she died."

Continuing the opinion, emphasis was laid upon the words of the will, "to leave her a memorial of my wishes as to its ultimate distribution unless circumstances should alter." These were logically regarded as intending to be supplemental to the devise to the brothers and sisters and to indicate the wish that such devise should take effect unless "circumstances should alter" and that the power of appointment was not to

be exercised except in the contingency; that the naked power was regarded as a matter of secondary importance and it was not made to appear that there was any alteration or change in the condition or circumstances surrounding either the daughter or the contingent devises. Not only was that an extreme and unusual case, but there is no such memorial of wishes contained in the Meriwether will, nor anything else to indicate a restriction or limitation upon the clear and consistent grant of a general power of appointment.

2. Mrs. Henning left many creditors, and the estate to which she had legal title was insufficient, by a large sum, to satisfy her debts. It is conceded that if she had not executed the power of appointment of the "Allendale" farm, and it had passed as provided in Mrs. Meriwether's will, in default of execution, it could not be subjected to the payment of her debts. But there is invoked the principle prevailing in England, and in some jurisdictions of this country, that property which is the subject of a general power of appointment is in equity deemed assets of the one holding the power for the payment of the demands of his creditors, where his individual estate is insufficent, if he exercises the power and appoints others, called "volunteers," as recipients. A lesser number of courts have not accepted the doctrine. The theory is that where the donee may appoint whomever he chooses, it is his duty, if he exercises the power at all, to appoint his creditors, and the appointment of others amounts to a fraud upon his creditors, which equity will frustrate by holding the property to be equitably assets for the payment of his debts. The English Court of Appeals in Chancery, in 1916, in O'Grady v. Wilmot, 2 A. C. 231, summarized the reasoning thus:

"It was considered contrary to good faith to permit a power to be exercised in favor of volunteers so to defeat the creditors of the donee of the power. The court therefore intercepted the fund—to use the language of Lord Hardwicke, 'stopped it in transitu'—and, either by regarding the appointee as trustee for the creditors, or by virtue of saying that in the circumstances the creditors had an equity against the fund, caused it to be applied for the payment of the debts; but the fund was not any part of the estate of the donee of the power, nor

was it anywhere decided that it passed to the executor.''

The doctrine seems to have had its origin in a decree rendered in 1695 in a case in which the person executing the power had in effect reserved the power to himself in granting away his estate. But in the development of the law, the same rule of seizure was applied to the cases of execution of a general power of appointment by willing property of which the donee had never had any ownership or control during his life. Holmes v. Coghill, 12 Ves. Jr. 206, 33 Eng. Reprint 79; Story's Equity, sec. 243, note. But the English fathers held the rule not applicable to married women under the same circumstances. 3 Pomeroy's Equity, sec. 1106; 7 L. R. A. 143, note. The principle was impugned in some English cases and doubts expressed whether its original introduction to the equity practice was well warranted (as reviewed in O'Grady v. Wilmot, supra); nevertheless, it had existed as a part of the system of equity as administered in England for a long period before the Revolutionary War. 2 Sugden on Powers, 27; Boyce v. Waller, 39 Ky. (9 Dana) 478; Johnson v. Cushing, 15 N. H. 298, 41 Am. Dec. 694; Clapp v. Ingraham, 126 Mass. 200; Hill v. Treasurer, 229 Mass. 474, 118 N. E. 891, L. R. A. 1918D, 337; Vinton v. Pratt, 228 Mass. 468, 117 N. E. 919, L. R. A. 1918D, 343, annotations page 346; Freeman's Adm'r v. Butters, 94 Va. 406, 26 S. E. 845; Brandies v. Cochrane, 112 U. S. 344, 5 S. Ct. 194, 28 L. Ed. 760; U. S. v. Field, 255 U. S. 257, 41 S. Ct. 256, 65 L. Ed. 617, 18 A. L. R. 1461; Annotations 59 A. L. R. 1513; 49 C. J. 1276; 21 R. C. L. 785. For some reason into which we have not inquired, the English enacted the rule into a statute in 1838. 1 Tiffany, Real Property, sec. 332; 1 & 2 Vict. c. 110, s. 13.

Although the principle may have been previously recognized in this country, the New Hampshire case of Johnson v. Cushing, supra, decided in 1844, seems to have been the first to make application of the rule. The Massachusetts court, probably more than any other, has followed the rule and been its chief exponent. Although in its first and leading case of Clapp v. Ingraham, supra, the court calls it "a doctrine so just and equitable in its operation," its adherence seems to have rested on the ground that it was so clearly established in England and supported by such weight of authority that it

could not be set aside "because of doubts of the technical soundness of the reasons on which it was originally established." As disclosed in the note to 59 A. L. R. 1513, and by a limited reading of our own, the Supreme Court of the United States and some state courts have merely recognized the existence of the doctrine, without finding it necessary in the several cases to apply it. The courts of Illinois, Massachusetts, New Hampshire, New Jersey, North Carolina, and Virginia have made application and enforced it. It is of interest to observe that in scarcely any of these opinions was there any attempt at justification. On the contrary, the weakness of the reasoning has been recognized and criticisms of English and American courts have continued from the very beginning. It has, as well, received the disapproval of Chancellor Kent (Kent's Commentaries, page 394 [12th Ed.]), Justice Story (Story's Equity, secs. 242, 250), and other eminent authorities. Running through the opinions there is almost an apology for adhering blindly to the precedent.

In a Pennsylvania case decided in 1849 (Commonwealth v. Duffield, 12 Pa. 277), the chief justice exposed the fallacy of the doctrine. His classic argument justifies an extended quotation. Referring to the theory that the execution of the power converted the property into equitable assets of the donee, he said:

"Truly speaking, it was not. Such a fund is certainly not legal assets, for it does not go into the executor's hands in a course of administration. It could not be a part of the appointer's effects while he was living, and it cannot be so when he is dead; for a title which did not vest in him when he had capacity to take, could not vest in him when his capacity was lost. Yet an English chancellor intercepts the money on its way to the appointee, and applies it to the appointer's debts, not as an actual part of his effects, but as what, according to the chancellor's notion of justice, ought to have been made so for the benefit of his creditors. As was said in Harrington v. Harte [1784] 1 Cox, Ch. Cas. 132 [29 Eng. Reprint, 1095], he stops it in transitu when a step has been taken to appoint it to the use of any one else; and this arbitrary control of the direction given by the testator to his bounty through the agency of his proxy, is strangely put upon the

obligation of the proxy to pay his debts; the assumed violation of which, in not paying them with money filched from his wife or child—in not robbing Peter to pay Paul—is held to give his creditors a specific equity against his appointee! 'It may be a hard case,' said Lord Hardwicke, in Townshend v. Windham [1750] 2 Ves. Sr. 8 [28 Eng. Reprint, 5], 'but I must not make a precedent that men may make a provision for their families in prejudice of their creditors.' Notwithstanding my habitual respect for the judgment of that great man, I am unable to see any wrong of which the creditors could complain. There is such flagrant injustice in applying the bounty of a testator to the benefit of those for whom it was not intended, that the mind revolts from it. An appointee derives title immediately from the donor of the power, by the instrument in which it was created; and consequently not under but paramount to the appointer, by whom it was executed; by reason of which it is impossible to conceive that the appointer's creditors have an equity. A man who is employed to manage the conduit-pipe of another's munificence, is authorized by a general power of disposal to turn the stream of it to any person or point within the compass of his discretion; and his creditors have no right in justice or reason to control him performing his function because it was not assigned to him as their trustee. It is the bounty of the testator, and not the property of his steward, that is to be dispensed. In the words of Lord Hardwicke, it would be a hard case if he were allowed to provide for his family under a power designed for his creditors; but a general power, instead of the ownership, is usually given to enable him to pass them by; and to give them what was intended for objects exclusively in the testator's view, is a fraud on him. He might have excluded them by an express restriction, and he enables the appointer to do so, by investing him with all his power. The vice of the English principle is its disregard of the donor's purpose; in which respect it is not more unfortunate than a charitable donation to a superstitious use. An unlimited power of disposal is sometimes said to be equivalent to ownership, because it enables the per-

son who possesses it to make the property his own; but to have 'that effect it must be executed.''

Quoting from an English case to the effect that although the donee of the power was bound to pay his own debts, he could not be called upon by law to pay them out of an estate which is the property of another person, ''Yet, equity does so strong an act as to pay them out of the estate which was vested not in him, but in his son.'' The chief justice observed:

> ''Right or wrong, it was emphatically a strong act. Yet, on foot of this shallow equity, bred by the temper of the bankrupt laws, whose design is not to do justice, but to foster credit, an English chancellor puts his hand into the fund, and serves it out to the appointer's creditors.''

As disclosed in the exhaustive annotations in 59 A. L. R. 1523, several courts have exhibited an impatience with the irrational doctrine, although they did not find it necessary to reject it specifically, as the cases were decided upon other grounds. It was likewise regarded in Balls v. Dampman, 69 Md. 390, 16 A. 16, 1 L. R. A. 545, and Price v. Cherbonnier, 103 Md. 107, 63 A. 209, and expressly rejected in Prince de Bearn v. Winans, 111 Md. 434, 74 A. 626. It was rejected also in Humphrey v. Campbell, 59 S. C. 39, 37 S. E. 26. Critically reviewing the many English cases, the Vermont court in Wales' Adm'r v. Bowdish's Ex'r, 61 Vt. 23, 17 A. 1000, 4 L. R. A. 819, regarded them as not being authority for the appropriation of property passing under a power to the payment of the donee's debts because the clear intention of the donor testator being otherwise; the effect of the conclusion being to refute the rule as usually laid down.

The case of Rhode Island Hospital Trust Co. v. Anthony, 49 R. I. 339, 142 A. 531, 59 A. L. R. 1501, contained a general power and a directed disposition upon the failure to exercise it much like the one at bar. Other than the claims of a pretermitted illegitimate child, there were claims of the donee's creditors of a right to the property which was the subject of the power, as against the appointees of the power. After reviewing the authorities and reasons, the doctrine was expressly repudiated.

The New York court followed the English rule in an early case, but in Cutting v. Cutting, 86 N. Y. 522, it seized on the tenuous distinction afforded by a subsequently enacted statute relating to the construction of powers, to break away from it. The facts there also were like those before us here, in that a mother devised property in trust for life to a son, to whom she gave a testamentary general power, and he appointed it in trust for his two sons. A judgment creditor of the donee sought to subject the estate. Regarding the statute as a complete and exclusive code on the subject of powers, and finding no provision in it disclosing an intent that such an estate should be subject to the operation of the rules of English equity, the court held that it ought not to be so subjected. Going further, it deduced a purpose in the statute to abrogate those rules since it was stated to be "to place the doctrine of powers on rational grounds." It reasoned thus:

> "Now it is hard to call the ground rational, on which the rule of English equity was put, when the estate embraced in a power to appoint generally by will was made liable to the claims of creditors, if the power was executed, but exempt therefrom if it was not executed. The acumen of lawyers and judges forced them to see that sound logic would not tolerate so refined a distinction, and there was a struggle to carry the rule further, and to make the existence of the power, though unexecuted, subject the estate to the debts of the donee of the power. And it was sought to base it upon the proposition, that the right to dispose of property was equal to the ownership of the property."

The conclusion was that the rule should not be again regarded as a law of New York. As stated by the learned author of the Annotations in 59 A. L. R. 1524, the provisions of the statute were by no means explicit on the point, "and doubtless could and would have been construed in a way to reconcile them with it if the court had not welcomed the opportunity to abrogate a principle which it is clear from the opinion was thought unsound and unfair."

In United States v. Field, supra, the Supreme Court, in the course of the opinion, took notice of the rule as being chiefly relied on by the government to

subject to the federal tax on the transfer of a decedent's estate property which had been disposed of by him under a general power of appointment. It was held not to be taxable, since it was not the property of the donee, nor did it come within the purview of another clause of the law taxing the transfer of an interest in property during life to take effect at or after death. As stated above, although the Supreme Court has recognized the existence of the doctrine, we do not find that it has ever determined whether it would or would not follow it. The same conclusion with respect to inheritance taxes was reached in Hill v. Treasurer, supra, by the Massachusetts Supreme Court; also by Connecticut in McMurtry v. State, 111 Conn. 594, 151 A. 252.

Following this review of the foreign authorities, we may well look within our own house.

In Payne v. Johnson's Ex'rs, 95 Ky. 175, 24 S. W. 238, 609, 15 Ky. Law Rep. 522, Woolley acquired under the will of his mother a moiety in fee simple and a moiety for life with power of general appointment in a certain tract of land. The power could have been exercised by deed or will. He executed a series of instruments which the court regarded as legally affecting only the interest in fee. In the end, Woolley's informal will was construed as providing first for the payment of his debts and the balance as devised to his sister and brothers, and the court held that the moiety in the estate over which he had the power was embraced in his disposition, and accordingly was made subject to the payment of his debts under the appointment. The case is not in point here.

In Boyce v. Waller, 39 Ky. (9 Dana) 478, Elizabeth Boyce, a widow, being about to marry Gerard McKinney, in 1812 executed a deed of trust of her property to Henry Clay and Thomas Bodley for the benefit of herself and her intended husband and the survivor, who at his or her death was given the power to convey to whomsoever he or she should appoint by last will or other instrument, and in default of such appointment then it was to go to the issue, if any, of the intended marriage, and, if none, to certain named persons. In 1827, making reference to the deed of trust of 1812, another instrument was executed by McKinney and wife. It conveyed certain named slaves upon the same trust

and purported to execute jointly what was recited as a joint power by directing the trustees to convey the estate to their children born since their marriage. After a time, Waller, a judgment creditor of McKinney, levied on the property embraced in those conveyances, and a suit to enjoin any sale under the levy was instituted by Mrs. McKinney and the children and another who claimed to have purchased the property from McKinney. The opinion, by Chief Justice Robertson, discusses some of the complications and points arising, the basis of which makes the case not a clear-cut one on the sharp issue now before us. Referring to the English doctrine that a voluntary execution of the power of appointment sufficient to imply ownership by the donee should be generally deemed a fraud on his creditors, it is stated:

> "And this judicial doctrine has been virtually recognized by the Legislature of this State, in that provision in the statute against fraudulent execution of a general power of appointment by will, fraudulent as to the creditors of the donee of the power, unless they or some of them be the appointees."

Discussing the joint execution of the appointment to their children of the property covered by the deed of trust, the opinion continues:

> "But however this may be, or whatever may be the true doctrine as to the effect of a joint appointment when the power belongs to the survivor [and as to which we will not now express a conclusive opinion], it seems to us that, if the appointment as made in this case, should be deemed an effectual execution of the power, still it was not such an act as manifested ownership by McKinney, or an intention to exercise any dominion over the property. We have seen no case in which it was ever held that, the execution of a general power by appointing the person or persons who would be entitled under the grant, in default of execution, should be deemed fraudulent as to the creditors of the donee of the power. And such a doctrine would be a perversion, or rather an ultra application, of the principle of the cases which have been cited, and of all other adjudged cases on the same subject. Had there been no attempt at any appoint-

ment in this case, the very persons to whom the appointment was made, would have taken precisely the same interests under an express grant to that effect in the deed creating the power.

"Do they not, therefore [like heirs to whom the same interest which they would have inherited, had been devised], hold under the deed of 1812, independently of the power, or the execution of it, precisely as they would have held had there been no attempt at execution?"

The conclusion of the court was that whether the power be deemed general or special, McKinney's creditors had no right to subject any portion of the property embraced in the trust of 1812. The decision, however, seems to have been placed upon the ground that the appointment had not been exercised in the manner or mode provided by the instrument creating it; hence the property passed to those entitled to it in default of execution. But there is much in the opinion that is helpful. The English doctrine was embodied in our statutory law at that time. Although the opinion does not cite it, the statute was enacted in 1796 and is to be found in 1 Littell's Laws, page 507. It is to be observed that even with that controlling statute, the court indicates that it and the doctrine of fraudulent diversion did not permit creditors to seize the property where the appointment under a general power was made to persons who would be entitled under the grant in default of execution. Of such is the appointee, Suzanne De Charette, in the instant case. Moreover, may it not be said, well and logically, paralleling the line of thought of the New York court in Cutting v. Cutting, supra, that, since our Kentucky statute was subsequently repealed, it was the intent of the Legislature that the doctrine itself should be abrogated, even as the New York court held its statute on trusts, by omitting the rule of equity, effectually abrogated it?

Independent of the dictum of Judge Robertson (which, however, in respect of the fact that the appointees of the abortive appointment were the same as those who would have taken in default of any exercise, undoubtedly had its effect on the decision of the court), the specific question of following the English equity rule or not is open in this jurisdiction, and we have the

choice of following one or the other lines of authority built up in this country.

We have seen that the English courts went astray from and far beyond the incipient case, where there was a deed of appointment in which the donor was also the donee, and the effect of the power of appointment and its exercise if sustained would have diverted his own property into a channel beyond the reach of his creditors—a mere fiction, fraud or sham, operating to frustrate the collection of the debts of the owner of the property and not those of another. Without desiring to lay ourselves open to the charge of undue assumption of discrimination, we cannot escape the thought that the mischief in the law is the product of the psychology of the time. The doctrine was born and cradled in an era when the law was made by creditors and for creditors, while poor debtors were travailing in various degrees of affliction. This seems to be a classic example of where an accumulation of precedents has become a law to excuse a wrong rather than to justify a right. Reason need not lose its force to precedent. As the property was never the donee's, and the court could not have seized it while he lived, nor compelled him to execute the power for his creditors or anybody else, nor taken it in default of its exercise, is it not a species of judicial tyranny to snatch it away from those for whom the creator of the power intended it?

Upon reason and the authority of those courts which have rejected the doctrine, and the deductions we have made in respect of the repeal of the old statute referred to in Boyce v. Waller, supra, we conclude that the property involved in this case was not subject to the satisfaction of the debts of Mrs. Henning, the donee of the power, except to those two named by her in the exercise of the appointment, Holt and Godfroy, who, obviously, take as appointees and not as creditors.

The judgment below was to this effect except as to these two appointees, although it was rendered upon the ground that the power was special rather than general. In so far as the judgment denies the creditors, excepting these two, any relief, it is affirmed.