ELVIRA MAY McNALLY LORD AND MARY VIR-
GINIA LORD v. EDMUND JOSEPH LORD, ET AL.

No. 2386.

Argued April 18 and 20 and
Submitted April 21, 1939.          Decided May 23, 1939.

Coke, C. J., Kemp, J., and Circuit Judge Metzger
in Place of Peters, J., Absent.

OPINION OF THE COURT BY COKE, C. J.
(Kemp, J., dissenting.)

This cause comes here on an interlocutory appeal from
an order of the circuit judge of the circuit court of the
first judicial circuit, sitting in equity, overruling the
demurrers of appellants to appellees' bill of complaint.
The purposes of the suit were to enforce a trust and for
other relief.

Elvira May McNally Lord, hereinafter referred to as "Mrs. Lord," the divorced wife of Edmund Joseph Lord, hereinafter referred to as "E. J. Lord" or "the settlor" and Mary Virginia Lord, hereinafter referred to as "Mary Lord," his minor daughter, brought in the court below a suit to enforce a trust created by E. J. Lord in a deed executed by him dated December 22, 1930. The respondents are: E. J. Lord; Thomas Desmond Collins, successor trustee under said deed of trust; Albert Edmund Lord and George Marion Lord, sons of the settlor and the petitioner Mrs. Lord, who, together with the petitioners, are named beneficiaries under the deed of trust; a minor granddaughter of the settlor and Mrs. Lord; the New York Life Insurance Company, which holds, by assignment, a policy of insurance issued by it upon the life of the settlor as security for a loan; John S. Grace, trustee under an assignment made by the settlor for the benefit of himself and certain of his creditors; the board of water supply of the City and County of Honolulu, trustee, hereinafter called "the board," which holds certain property conveyed by the trust deed as security for obligations of settlor for the faithful performance of two public contracts entered into with the board; D. L. Conkling, treasurer of the City and County of Honolulu, who claims a lien upon certain of the trust property to secure payment of certain improvement district assessments; the City and County of Honolulu, the petitioner in a proceeding in eminent domain involving certain of the trust property; Patricia Lord, the present wife of settlor; and sundry judgment creditors of the settlor.

The bill recites that on April 27, 1926, Mrs. Lord procured a divorce from the settlor; that the decree of divorce directed the settlor to pay to her $500 per month as alimony and for the support and education of her daughter Mary,

then a minor; that on December 22, 1930, the settlor conveyed to the Hawaiian Trust Company, Limited, as trustee, certain real property, and, by supplemental trust indenture dated December 26, 1930, conveyed to the trustee certain additional property to be held and administered as a part of the trust estate under the trust deed of December 22, 1930, the trust property being described in the two documents named, which documents are appended to the bill of complaint.

The terms, purposes and conditions of the trust deed which substantially bear upon the present controversy are as follows: "That the settlor, in consideration of his love and affection for his former wife, Elvira May McNally Lord, sometimes referred to herein as May Lord, and of her children by the settlor, to-wit, Albert Edmund Lord, George Marion Lord and Mary Virginia Lord, hereinafter called the 'Beneficiaries,' and also in consideration of the terms, covenants and conditions in this instrument expressed on the part of the trustee to be observed and performed, does hereby grant, assign, transfer, set over and deliver unto the said Hawaiian Trust Company, Limited [here follows description of property transferred], * * * TO HAVE AND TO HOLD the same and all proceeds thereof and all property whatsoever into which the same, or any part thereof, at any time or times may be resolved by investment, reinvestment, exchange or otherwise, unto the said trustee and its successors in trust hereunder subject to the terms, conditions, charges and powers hereinafter mentioned and upon the following uses and trusts, namely: (1) To hold and manage the trust estate and to receive the rents, profits and income thereof and to pay from said property and from said rents, profits and income, all expenses and disbursements properly chargeable thereto respectively and to deal with and dispose of

the remaining rents, profits and income in the manner and for the uses and purposes hereinafter set forth. (2) On behalf of the settlor to perform, pay and discharge the obligations of the settlor required and imposed by the provisions of the decretal order of divorce on, to-wit, April 27, 1926, entered in the Division of Domestic Relations of the Circuit Court of the First Judicial Circuit in the matter of May Lord vs. Edmund J. Lord, Divorce No. 10638, in respect to alimony payable the libellant, May Lord, and support, maintenance and education of the beneficiary, Mary Virginia Lord, as the same now exists, or may hereafter be duly amended. (3) In the event of said decretal order of divorce in respect to alimony and/or support, maintenance and education of the said beneficiary, Mary Virginia Lord, becoming unenforceable or inoperative in whole or in part in respect to either the said Elvira May McNally Lord or to the said Mary Virginia Lord for any cause whatsoever, or the provisions thereof becoming insufficient for the purposes thereof in the judgment of the trustee, the following provisions in respect to the said Elvira May McNally Lord and/or the said Mary Virginia Lord shall respectively apply in lieu of and/or in addition to the provisions of said decretal order of divorce. (a) Out of the net income of the trust estate, to pay to the said Elvira May McNally Lord for and during the term of her natural life all sums necessary for the proper maintenance and support of the said Elvira May McNally Lord with full power and discretion vested in said trustee as to what may be necessary for her proper maintenance and support in so far as the same relates to the trust fund hereby created. (b) Out of the net income of the trust estate, to pay to or for the account of the said Mary Virginia Lord all sums necessary for the proper education maintenance and support of the said Mary

Virginia Lord for the joint lives of her mother, Elvira
May McNally Lord and the settlor and the survivor of
them, with full power and discretion vested in said trustee
as to what may be necessary for the proper education,
maintenance and support of the said Mary Virginia Lord
in so far as the same relates to the trust fund hereby
created. (4) In the event of any net income remaining
after the observance, performance and discharge of the
directions contained in paragraphs two (2), three (3),
three a (3a) and three b (3b) hereof, to pay to or for
the account of the said Albert Edmund Lord and to or
for the account of the said George Marion Lord for the
joint lives of their mother, Elvira May McNally Lord and
of the settlor and the survivor of them, all sums necessary
for the proper maintenance and support of the said Albert
Edmund Lord and the said George Marion Lord with
full power and discretion vested in said trustee as to what
may be necessary for the proper maintenance and support
of the said Albert Edmund Lord and the said George
Marion Lord in so far as the same relates to the trust
fund hereby created. In the event of any of the benefici-
aries, Albert Edmund Lord, George Marion Lord or Mary
Virginia Lord predeceasing their mother and the settlor
and the survivor of them, leaving child or children him
or her surviving, to pay to or for the account of such
surviving child or children of such deceased beneficiary
all sums necessary for the proper maintenance, education
and support of such child or children with full power and
discretion vested in said trustee as to what may be neces-
sary therefor in so far as the same relates to the trust
fund hereby created. The trustee shall not be obligated
to keep payments made to a class equal between members
of the same class. Any surplus income shall be accumu-
lated and become part of principal. * * * (7) The Settlor

hereby especially reserves to himself the rights (a) from time to time to change, modify or amend the provisions of this trust deed but not to revoke the same or to so change it that he will receive back any of the trust estate or any interest or income therefrom; (b) by written instrument to change the trustee under this instrument, whether named or appointed by virtue of this instrument or otherwise, and to appoint a new trustee in the place and stead of the trustee so relieved; and (c) to appoint a successor trustee to fill any vacancy which may occur in the office of trustee. Upon every appointment of a new trustee, the trust property and all interest thereof shall immediately become vested in the new trustee, and every such new trustee shall thereupon have all the powers, authority and discretion to perform the trust of these presents as though originally named in this instrument, and without necessity of any conveyance to it, him or her by the retiring trustee, if any. * * * (11) * ** * (d) Upon the death of the said Elvira May Mc-Nally Lord and of the settlor, or the survivor of them, the trustee hereunder shall transfer and convey absolutely and in fee simple the remaining trust principal subject hereto and any unapplied income therefrom to those who shall be then surviving of the beneficiaries, Albert Edmund Lord, George Marion Lord and Mary Virginia Lord, and of the children and issue of deceased children of any of said beneficiaries who shall then be dead, said children and issue taking per stirpes by right of representation the share their parent would have taken if then surviving; provided, however, that in case any one or more of said beneficiaries, Albert Edmund Lord, George Marion Lord and Mary Virginia Lord, shall predecease their mother and the settlor and the survivor of them and leave no issue of his or her body him or her

surviving, then and in every such case the trustee hereunder shall transfer and convey the portion of the trust principal and unapplied income, if any, which such issue would have received if in being or surviving, to those persons who would have been the heirs at law of such decedent in accordance with the laws of descent then obtaining in the Territory of Hawaii if he or she had died domiciled in said Territory at the time of said death of said Elvira May McNally Lord and of the settlor, or the survivor of them."

It is alleged in the bill that in June, 1932, the settlor ordered and directed the trustee named in the deed to deliver all of the property then comprising the trust to Thomas Desmond Collins; that shortly thereafter the trustee complied with these directions; that on August 19, 1932, by written instrument recorded in the office of the registrar of conveyances and filed in the office of the assistant registrar of the land court, the settlor, with the intent and as a preliminary step in a plan which he then had to change said deed of trust so as to cheat and defraud the petitioners out of any and all rights acquired and then held by them under said trust deed and to receive back all of the property then comprising the trust estate, purported to change said deed of trust, pursuant to the power reserved to him for that purpose, by naming and designating Thomas Desmond Collins as successor trustee to Hawaiian Trust Company, Limited, and purported to modify and amend said trust deed in such manner that petitioners were excluded from all benefits thereunder and all further interest in and to the property then comprising the trust estate and purported to authorize and direct the successor trustee to pay all of the net income of said trust estate to settlor's son, Albert Edmund Lord, during his life and upon his death to distribute all

of said trust estate to such persons as the settlor's said son may by his will direct and appoint; that on August 19, 1932, Albert Edmund Lord did not have, and that the settlor well knew that he did not have, sufficient mental capacity to understand the meaning of said written instrument, was under the absolute control and direction of the settlor and did not have, as the settlor well knew, the mental capacity to exercise the power of appointment which the settlor had purported to vest in him by said written instrument; that at said time, for a number of years prior thereto and at all times hereinafter mentioned, Albert Edmund Lord was mentally incompetent, lived with and was dependent upon the settlor for support and maintenance, had no experience nor ability to conduct business, looked to and relied upon the settlor for advice and counsel in business matters, had no independent advice from counsel and was under the absolute control and direction of the settlor; that on the 16th day of September, 1932, within one month after the purported change in said trust deed making Albert Edmund Lord the sole beneficiary of said trust, with the intent and in furtherance of the plan to change said deed of trust so as to cheat and defraud petitioners out of all benefits thereunder and to receive back all of the property then comprising the trust estate, the settlor caused and compelled Albert Edmund Lord to execute a written instrument by which he purported to convey to the settlor all of the right, title and interest, whether legal or equitable, to which he was or might be entitled by virtue of said trust deed as changed and modified, and directed the successor trustee to assign and convey to the settlor all of the property then comprising the trust estate, in consideration of which the settlor agreed to pay to the said Albert Edmund Lord $100 per month for the term of his natural life; that the successor

trustee, purporting to act pursuant to the authorization aforesaid and acting with full notice and knowledge of all of the provisions of the trust deed of December 22, 1930, transferred and delivered to the settlor all of the personal property then forming part of said trust estate and by a written instrument, dated September 16, 1932, recorded in the office of the registrar of conveyances and filed in the office of the assistant registrar of the land court, purported to convey to the settlor all of the real estate then forming a part of the trust estate and at the same time and as part of the same transaction, for a recited consideration of $10, Albert Edmund Lord purported to release, remise and quitclaim unto the settlor all of his estate, right, title and interest, both legal and equitable, in and to said property and that no consideration whatever was paid therefor by the settlor; that Albert Edmund Lord acted without knowledge and understanding of the effect of his acts and under the absolute control and direction of the settlor; that by reason of the execution and delivery of the instruments and the performance of the acts aforesaid by the settlor, Albert Edmund Lord, and the successor trustee the settlor acquired the possession and control of and the legal title to all of the real and personal property comprising the said trust estate and that on and after September 16, 1932, the petitioners were deprived of and since said date have received no income or benefit whatever from the trust estate; and that petitioners have been informed and believe and upon such information and belief allege that during a considerable period of time immediately preceding the date of the bill the settlor has failed to pay to Albert Edmund Lord the $100 per month or any other sum of money whatsoever and that the said Albert Edmund Lord is now destitute,

incapable of self-support and wholly dependent upon his mother, one of the petitioners, for maintenance.

It is further alleged by Mrs. Lord that the settlor has failed and refused to make the payments which became due and payable to her by the terms of the divorce decree aforesaid for a period in excess of one year prior to March 31, 1937; that on March 31, 1937, she filed an action against the settlor in the circuit court, law number 15360, in which she asked, and on May 4, 1937, was granted, a judgment against the settlor for all installments which were then overdue and that the settlor has failed and refused to pay said judgment or any part thereof and has failed and refused to pay all or any part of the installments which became due by the terms of said decree from and after May 4, 1937, to the date of the bill.

The bill of complaint further avers that subsequent to September 16, 1932, the settlor, pretending to be the owner of the trust *res*, by sundry conveyances made at different times prior to the institution of the present suit, purported to sell, transfer, assign or hypothecate all of the trust property to the respondents the New York Life Insurance Company, the board of water supply of the City and County of Honolulu and to John S. Grace, trustee, for the benefit of the settlor and certain of his creditors. It is further alleged that the respondents, in dealing with the settlor in relation to said trust property, did so with full knowledge and notice of the rights of petitioners in and to all of the property described in the trust deed of December 22, 1930, and with full knowledge and notice of all of the terms and conditions of said trust deed, including the provisions of paragraph seven thereof. It is further alleged in the bill that Grace Brothers, Limited; Honolulu Iron Works Company; the Hawaiian Electric Company, Limited; Honolulu Construction and

Draying Company, Limited; Lewers & Cooke, Limited; Island Welding and Supply Company, Limited; Ready-Mix Concrete Company, Limited; Hawaiian Bitumuls Company, Limited; Oahu Railway & Land Company; Walker & Olund, Limited; Tidewater Associated Oil Company, associated division, successor by merger to Associated Oil Company; Ralph E. Woolley; Rudolph W. Benz; Rodney T. West and T. T. Tanaka claim to have some interest adverse to the interests of petitioners in and to the real and personal property conveyed and assigned to the said board as beneficiaries under certain trust indentures executed by the settlor to said board and that some of the respondents above named and the Standard Oil Company of California; J. C. Hardy; L. T. Abshire; Frank Nichols; David A. Alama and Solomon Kam claim to have some interest adverse to the interests of petitioners in and to the property described in and conveyed by the deed of trust of December 22, 1930, by virtue of judgments that they have secured and docketed against the settlor or by virtue of the aforesaid assignment to John S. Grace, trustee, and that the respondent Patricia Lord claims to have some interest adverse to the petitioners in and to all of said property but that all of said respondents claim by, through or under the settlor and that none of them are innocent purchasers for value.

D. L. Conkling, treasurer of the City and County of Honolulu, is alleged to claim a lien upon certain of the trust realty for improvement district assessments and the City and County of Honolulu has pending a proceeding in eminent domain to acquire by condemnation a part of the lands in question.

The language of paragraph seven of the trust instrument is not entirely free from ambiguity. It reads in part: "The Settlor hereby especially reserves to himself the

rights (a) from time to time to change, modify or amend the provisions of this trust deed but not to revoke the same or to so change it that he will receive back any of the trust estate or any interest or income therefrom."

The appellants urge that while the settlor could not have entirely revoked the trust deed he had the reserved power to revoke the provisions thereof granting benefits to the appellees. The appellees do not so construe the effect of the trust instrument. They assert that paragraph seven prohibits the revocation of the grant to them of sufficient of the trust net income for their proper maintenance, etc., as provided for in paragraph three of the trust deed during the life of the trust.

The trial judge held that Mrs. Lord and Mary Lord took a vested right in the annuity granted to them by the settlor which was indefeasible through any act of the settlor during the period of the trust as fixed by the trust document.

The leading cases coming to our attention which deal with the powers of a settlor to shift the economic benefits of a trust estate from the original donees to others, as well as the power of a donor to terminate a trust, are: *Porter* v. *Commissioner of Internal Revenue*, 60 F. (2d) 673 (affirmed 288 U. S. 436) ; *Cross* v. *Nee*, 18 F. Supp. 589; *Brady* v. *Ham*, 45 F. (2d) 454; *Cover* v. *Burnet*, 53 F. (2d) 915; *Faulkner* v. *Irving Trust Co.*, 246 N. Y. S. 313.

It is clear from the language employed by the settlor that his primary and dominant purpose in creating the trust was to provide maintenance for his former wife, maintenance and education for his daughter Mary, and maintenance for his two sons Albert and George. He acknowledged the financial obligation to his divorced wife as fixed by the decree of the circuit court in the divorce

proceedings already adverted to and expressly declared that the moving consideration for the establishment of the trust was his love and affection for his former wife and his three children.

But regardless of whether the trust deed in question conferred upon the appellees a vested annuity of which they could only be divested upon the termination of the trust pursuant to the provisions of the trust deed as held by the trial judge or whether the settlor possessed the reserved power to revoke the provisions of the deed conferring beneficial rights upon the appellees, and upon entirely different grounds, the demurrers should have been overruled and the order appealed from must be sustained.

The settlor, by the most clear and explicit language, put it beyond his power to revoke the trust or to take back to himself the trust corpus or any income therefrom. However he did both with thoroughness and dispatch. On August 19, 1932, he named Collins successor trustee to the Hawaiian Trust Company, Limited, removed Mrs. Lord and Mary Lord as beneficiaries and designated his son Albert Edmund Lord, an imbecile, sole beneficiary of the trust estate. On September 16, 1932, he and his son Albert executed a joint document by the terms of which Albert conveyed all of his interest in the trust property to his father and directed Collins to convey to the latter the equitable estate therein and E. J. Lord agreed to pay to his son the sum of $100 per month during his lifetime. Thereafter, and on the same day, Collins transferred to E. J. Lord, for a nominal consideration, his equity in all of the trust property, Albert joining in the conveyance of the trust realty, so that within a period of thirty days and as a result of these several transactions E. J. Lord not only became the owner of the entire trust *res* but completely revoked and terminated the trust. He at-

tempted to do by circuity that which he could not do directly. Where a person does an act he is presumed in so doing to have intended the natural consequences thereof. Or, stated differently, where the probable and ordinary consequences of a man's act will be to benefit himself to the injury of others his intention to produce the result may be legitimately inferred. (*Holmes, et al.* v. *Holmes, et al.,* 37 Conn. 278.) It is proper to infer from the circumstances divulged by the bill of complaint in the case at bar that E. J. Lord, in August, 1932, deliberately and by a preconceived scheme and device and in defiance of the plain terms of his trust document, set about, through the medium of a facile donee, to reinstate himself as owner of the entire trust property as well as to destroy the trust itself. Equity, therefore, will inquire whether the limitations on the power of the settlor, as defined in the trust document, have been transcended and the rights of third parties violated. It is a maxim that equity regards the substance rather than the form. The parties are not to be sacrificed to the mere letter but the intent or spirit of the transaction will, at least in equity, be the paramount consideration. Equity goes behind the form of a transaction in order to give effect to the intention of the parties and to impose a liability as against an evasion by a formal concealment of its true character. (19 Am. Jur. 318; 21 C. J. 204; *Texas* v. *Hardenberg,* 77 U. S. 68, 89.)

In *Brady* v. *Ham, supra,* a case where the settlor reserved the right to designate other beneficiaries than those named in the trust instrument *except herself,* the court held that "she [the settlor] could not take it [the trust property] back, either *directly or indirectly."* (Italics supplied.)

The opinion in *Faulkner* v. *Irving Trust Co., supra,* is strongly relied upon by appellants. The federal circuit

court of appeals of the second circuit, in an opinion written by Judge Learned Hand, in *Porter* v. *Commissioner of Internal Revenue, supra,* commented upon the *Faulkner* case in the following significant language: "In Faulkner v. Irving Trust Co., 231 App. Div. 87, 246 N. Y. S. 313, the settlor could not revoke until he was thirty-five years old, but by changing the beneficiary and getting the consent of the substitute, he avoided the limitation. The Court of Appeals of that state has not, however, passed upon the point, and we are not entirely satisfied that the rights of existing beneficiaries can be circumvented by such a device. It may eventually be held that while the donee of the power is at liberty to revoke and reappoint at his pleasure, his choice must not violate the condition upon its exercise, either directly or indirectly. If so, the original interests are defeasible only when the settlor does not profit by the change, and equity will inquire whether this limitation has been observed, or whether the whole contrivance is in violation of the trust." The opinion of the State court of New York in the *Faulkner* case is supported by neither authority nor reason and we not only share the federal circuit court of appeal's skepticism of the doctrine announced but refuse to adopt it as the law of this jurisdiction.

All of the several documents mentioned were promptly placed of record and it is alleged in the bill that the appellants dealt with E. J. Lord with full knowledge and notice of the rights of the appellees in the trust property and of the limitations upon Lord's power to deal with the trust property as set forth in his trust deed. In the light of these facts the appellants could not have been innocent purchasers without notice but on the contrary dealt with the settlor and the trust property with notice and at their peril. We think it would savor of extreme and unwar-

ranted technicality to refuse to see in the bill of complaint sufficient to entitle the appellees to a trial upon the facts.

Assuming, as we must in the consideration of the demurrer, the truth of the allegations of the bill of complaint, it is obvious that the document executed by E. J. Lord on August 19, 1932, and the transfer by Collins to Lord and the joint document executed by Lord and his son on September 16, 1932, were void and the trust property must be administered under the provisions of the original trust executed by E. J. Lord and dated December 22, 1930.

The remaining issues, which may be termed the secondary questions raised by the demurrers of appellants, have all been carefully and fully considered with the result that we deem them to be without merit.

The order appealed from is sustained and the cause is remanded to the lower court for further proceedings.

*J. P. Russell* (*Thompson, Wood & Russell* on the brief) for respondent-appellant New York Life Insurance Company.

*H. Edmondson* (*Smith, Wild, Beebe & Cades* on the briefs) for certain respondents-appellants.

*C. D. Pratt* and *D. H. Porteus* (*Stanley, Vitousek, Pratt & Winn* on the briefs) for certain respondents-appellants.

*D. C. Lewis* (*Robertson, Castle & Anthony* on the briefs) for respondent-appellant Thomas Desmond Collins.

*E. J. Botts* filed brief for certain respondents-appellants but did not argue.

*Anderson, Marx, Wrenn & Jenks* filed brief for certain respondents-appellants but did not argue.

*W. R. Ouderkirk* (*Henshaw & Ouderkirk*, attorneys for George Marion Lord, on the brief) guardian ad litem for Rosemary Marion Lord, a minor.

*G. N. Nowell* (also on the brief) for petitioners-appellees.

*G. R. Corbett,* Deputy City and County Attorney (also on the briefs), for board of water supply.

*W. C. Tsukiyama,* City and County Attorney, filed briefs for the City and County and D. L. Conkling, treasurer, but did not argue.

### DISSENTING OPINION OF KEMP, J.

I am unable to agree with the majority opinion and shall set forth my reasons although I realize that dissenting opinions are of very little value.

The majority opinion contains a sufficient statement of the allegations of the bill. It seems necessary, however, to a clear understanding of the issue upon which my opinion is based, to state that the divorce decree did not require the settlor to give security for the payment of the alimony award. The trust was therefore voluntary. It also seems necessary to state that the demurrers which were overruled, and from which ruling an interlocutory appeal was allowed, had as one of the grounds thereof the following: "That it affirmatively appears from said petition that the said Edmund Joseph Lord expressly reserved the right from time to time to change, modify or amend the provisions of said deed of trust and that in the exercise of this reserved power said Edmund Joseph Lord so changed modified and amended the provisions of said trust so that the petitioners and all of the beneficiaries originally named in said deed of trust were deprived of any further beneficial interest thereunder, with the exception of Albert Edmund Lord, and that the petitioners have therefore been deprived of all right to maintain this action or claim any benefits as beneficiaries or otherwise

under said deed of trust or to enforce the same in any way."

The basis of the majority opinion is that the conveyance and release of September 16, 1932, is, by reason of the fraudulent intent of the settlor, void. The question of the legal right of the settlor to do what he undertook to do by the instrument of August 19, 1932, is left undecided. To my mind that is a very important question which must be determined in order to arrive at a proper solution of our problem. I think that the so-called imbecility of Albert Edmund Lord did not disqualify him to be named beneficiary of the trust. If, therefore, the settlor acted within his reserved rights when he appointed his son sole beneficiary, the petitioners cannot maintain this suit for the reason that they no longer have a litigable interest in the subject matter.

I think it is clear that by the trust deed the settlor divested himself of all interest in the properties therein described and, subject only to the reserved right, transferred full title to the trustee and the beneficiaries. (*Porter* v. *Commissioner*, 288 U. S. 436, 440.) Our first concern, therefore, is whether by the instrument of August 19, 1932, the settlor exceeded the rights which he reserved to himself. If the portion of the deed providing for the payment of income and distribution of corpus may properly be termed "provisions of the trust deed," and as to that I do not think there is any doubt, the settlor clearly reserved to himself the right to change the same, provided the change did not revest in him any interest in the trust estate. The language used by the settlor admits of no other construction. That being true it follows that if the rights of petitioners may properly be said to have been vested they were vested subject to be divested by the sole act of the settlor. Stating the same proposition another

way, if the rights which the settlor reserved to himself included the right to shift economic benefits by eliminating some of the beneficiaries, obviously what he did on August 19, 1932, was within his reserved rights.

All of the parties apparently agree that the intention of the settlor as ascertained from the whole instrument. must be given effect unless it contravenes some positive rule of law. They also agree that the words used must be given their ordinary meaning in the absence of anything in the instrument to deflect them from that meaning.

Let us apply the above rules to the following language used by the settlor: "The Settlor hereby * * * reserves * * * the rights (a) * * * to change, modify or amend the provisions of this trust deed but not to revoke the same or to so change it that he will receive back any of the trust estate or any interest or income therefrom."

The settlor very clearly cut himself off from the right to revoke the trust deed or to so change it that he would receive back any of the trust estate or any interest therein or any income therefrom. It is equally clear that by the instrument of August 19, 1932, he did not revoke said trust deed nor did he so change it or any of its provisions that he would receive back any of the trust estate or any interest therein or any income therefrom.

The ordinary meaning of the transitive verb "change" as defined in Webster's new international dictionary is "to alter by substituting something else for, or by giving up for something else; to put or take another or others in place of; to make substitution of, for, or among, often among things of the same kind (in which case the object is in the *pl.,* and includes all the things among which the substitution is made) ; as, to *change* one's clothes, one's occupation, or one's intention; to *change* cars or trains."

What the settlor did then was to change certain pro-

visions of the trust deed by which the petitioners had been appointed to take income and by which one of the petitioners and the settlor's sons were to share in the distribution of the trust estate at its termination. By said change he put (or appointed, if you please) one of his sons to take all of the income and eliminated the original remaindermen, making other provisions for the appointment of remaindermen.

I think there is further evidence in the language used by the settlor by which he reserved to himself the right which he undertook to exercise that he intended to reserve to himself the right to do exactly what he did. If he did not intend to reserve to himself the right to eliminate beneficiaries the prohibition against so changing the deed that he will receive back any of the trust estate or any interest or income therefrom is surplusage. The exclusion of himself from the right to be named a beneficiary implies the right to name others as such. See *Cross* v. *Nee,* 18 F. Supp. 589, where the court said: "Strongly indicative of the intention of the trustor to reserve such a control is the one limitation which he placed on the reservation of power to himself, to wit: ' * * * But the trustor does not reserve the power to revest in *himself* title to any part of the corpus of the trust, and the Trustor does not reserve or possess the power to have the interest, income, or dividends of the trust distributed to *him* or be held or accumulated for future distribution to *him* and/or applied in any way or manner for *his use and/or benefit.'* Specific limitations or exceptions strengthen the general words of an instrument. In construing the limitation it is to be noted it applies only to the revesting of interests in the *settlor*, and since it only prohibits revesting in the latter, the limitation, when considered in connection with the general expression of power, produces the inference that

limitations which were omitted but might have been included were not intended to exist. Expressio unius est exclusio alterius."

By giving to the words used by the settlor their ordinary meaning I reach the conclusion that he reserved to himself the right to shift the economic benefits of the trust so long as he did not take back to himself any of the trust estate or any interest therein or income therefrom. This view is, I think, supported by respectable authority.

The reserved power in the trust deed construed in *Cross* v. *Nee, supra,* is very similar to the reserved power here under consideration. In the trust deed there construed the reserved power to change is couched in the following language: "The Trustor during his lifetime shall have the right at any time to modify, amend, alter or change this trustee agreement in such manner as he may desire, but the Trustor does not reserve the power to revest in himself title to any part of the corpus of the trust, and the Trustor does not reserve or possess the power to have the interest, income or dividends of the trust distributed to him or be held or accumulated for future distribution to him and/or be applied in any way or manner for his use and/or benefit." By the above the trustor reserved to himself powers which I believe to be identical with the powers which the settlor reserved to himself in the deed here under consideration. If it were not for the further provision in the deed there construed, giving to settlor's wife and brother power to make changes after his death but expressly denying to them the power to impair, destroy or diminish the estate or corpus or income of the trust estate or the estate of the beneficiaries therein, there would be nothing upon which to base an argument differentiating the two deeds. Obviously the court considered all of said provisions in reaching its conclusion

that the trustor had reserved to himself the power to eliminate beneficiaries named in said deed and substitute others. However, in construing the language reserving to the trustor the right to modify, amend, alter or change this trust agreement, the court, without reference to the limitation on the right of his wife and brother to make changes, said: "As used in the several instruments, the word 'change' is broad enough to include the substitution or addition of beneficiaries as well as other provisions of the trusts. Granting that the other words definitive of the reserved power might not be sufficient to authorize a shifting of the beneficial interests, yet the word 'change' is much broader than the others. It might be said that to amend is to change for the better by removing defects or faults. It refers to that which falls short of excellence. To modify is to make different by change of quality. To alter is to change partially. But to change is to make a thing distinctly other than it has been. Again, in distinguishing between the words 'change' and 'alter,' Webster says: 'To change (the more general and stronger term) is to render something essentially different from what it was, even to loss of identity, or the substitution of one thing for another. To alter is to make different in some material respect, as in form or detail, without implying loss of identity.' Why would not the right to change include the right of substitution of parties or interests as well as other substitutions in the indentures? There seems to be little limit upon the conversion comprehended and allowed by the term."

Under the trust deed construed in *Faulkner* v. *Irving Trust Co.*, 246 N. Y. 313, the trust was to terminate when the settlor became thirty-five years of age and prohibited the settlor from revoking the trust until he reached that age. It contained a provision which authorized the settlor

to amend the instrument in any manner whatsoever except that he should not amend it so as to withdraw any of the securities comprising a portion of the trust. His sister was the sole beneficiary of said trust. The settlor exercised his right to amend and thereby eliminated his sister as a beneficiary by providing that in the event of his death, before the termination of the trust, his executors or administrators should receive the trust estate, to be distributed by them in accordance with his will. The settlor thereupon and prior to reaching the age of thirty-five years, delivered to the trustee a document executed by himself alone which purported to revoke the trust. The trustee denied his right to do this without the consent of his sister, the beneficiary named in the trust agreement, but the court upheld his right to terminate the trust on the ground that his amendment had eliminated his sister as a beneficiary and her consent was no longer necessary. The exact language of the trust deed is not disclosed by the opinion of the court. The above statement of its provisions is all that the opinion discloses. This is enough, however, to show that its provisions are quite similar to the provisions of the deed under consideration. The settlor reserved the right to amend the instrument "in any manner whatsoever." This right is not, in my opinion, any more comprehensive than the right which the settlor in the instant case reserved to himself. It did not contain the stronger word "change" here used. The right to "change, modify or amend" the provisions of the trust deed with the one restriction that he should not so change it that he will receive back any of the trust estate or any interest or income therefrom certainly means that he could change it in any manner whatsoever except in that one particular.

The only case cited which can be said to support the

theory of irrevocable vested rights in the named benefi-
ciaries is *Cover* v. *Burnet,* 53 F. (2d) 915. In fact
counsel who cite it say that long and diligent search has
produced no other case which may be said to be on all
fours with our problem. In that case the deed provided:
"I hereby reserve to myself the right, at any time or times
during my life, to alter, change, or modify the trusts
hereby created, without the right to withdraw any part
of the principal."

Although the settlor died without having exercised
his reserved right to alter, change or modify the trusts
the tax commissioner and the board of tax appeals held
that the reserved right included the right to make a re-
disposition of. the corpus of the fund and that, therefore,
the property of the trust was part of the decedent's estate
for estate tax purposes. The trust was for decedent's
children and descendants until "the youngest grandchild
of mine living at my death shall reach the age of twenty-one
years," the principal then to be divided among all living
descendants *per stirpes.*

The circuit court of appeals for the District of Colum-
bia, reversing the holding of the commissioner and the
board, said: "We do not agree with this claim, for it is
expressly stipulated in the reservation that the grantor
shall have no right thereafter to withdraw any part of
the principal from the trust. In other words, the grantor
reserved no power to repossess himself at any time of any
part of the principal of the fund, nor to withdraw the
same from the beneficiaries who were to receive it under
the terms of the trust instrument. Accordingly, the right
reserved by the grantor to alter, change, or modify the
trust did not extend to a redisposition of the corpus of
the fund, and even if by force of the reservation the grantor
could have demanded and obtained the entire income from

the trust fund during his lifetime, the irrevocable grant of the remainder would not have been affected thereby."

*Certiorari* was granted in *Porter* v. *Commissioner, supra,* for the reason that the opinion of the circuit court of appeals in that case was in conflict with the opinion in *Cover* v. *Burnet, supra,* and, after a hearing, the opinion of the circuit court of appeals in the *Porter* case was affirmed. In the opinion of the supreme court, which followed the granting of *certiorari* in the *Porter* case, no mention was made of *Cover* v. *Burnet, supra,* further than to say that *certiorari* was granted because of the conflict mentioned. Under these circumstances, even if it cannot be said that *Cover* v. *Burnet, supra,* was overruled, I think it is evident that it has, to say the least, been greatly weakened as an authority.

Considering the language used by the settlor, defining the rights which he reserved to himself to "change * * * the provisions of this trust deed," I can reach no other conclusion from all that appears from the documents than that the settlor did not exceed his reserved right when he executed the instrument of August 19, 1932. It follows that the demurrers should have been sustained on the ground herein discussed, unless there is merit in the further argument that what was then done in connection with what was later done amounted to a fraud upon the power which the settlor reserved to himself.

Being of the opinion that the right which the settlor reserved to himself to "change, modify or amend the provisions of this trust deed" included the right to shift the economic benefits set up in the trust deed, provided the shifting did not violate the limitation placed on that right by the further provision that by the change, amendment or modification the settlor should not "receive back any of the trust estate or any interest or income therefrom"

I conclude that the right which the settlor reserved to himself may be deemed to be the substantial equivalent of a general power of appointment by will (*Porter* v. *Commissioner, supra*), or of a special power of appointment by deed, and may be exercised only in conformity with the power. In the present case the only limitation placed upon the settlor's right to appoint may be said to be that he had no right to appoint himself but was free to appoint others at his pleasure.

There are certain clearly defined principles which the courts of England and a few American courts have applied to determine whether or not what the donee or owner of the power did in the exercise thereof amounted to an abuse of or a fraud upon the power.

*Matter of Carroll,* 274 N. Y. 288, 8 N. E. (2d) 864, 115 A. L. R. 923, cited by petitioners, was a case in which the donee of the power was authorized to dispose of the fund by will "to and among her children or any other kindred who shall survive her and in such shares and manner as she shall think proper." By her will she appointed a cousin to take the bulk of the property upon his agreement to settle one-half of it upon her husband, who was not an object of the power. This case illustrates the principle that where there has been a bargain between the donee or owner of the power and the appointee to benefit one who was not an object of the power, the appointment is void. Counsel for the petitioners do not claim that the facts which they have pleaded are analogous to the facts which controlled the decision in that case. In fact they admit that they are cut off from such a claim by the allegation of the incompetency of the appointee.

*Chenoweth* v. *Bullitt,* 224 Ky. 698, 6 S. W. (2d) 1061, also cited by petitioners, was a case in which W. Bullitt devised to his son Henry a life estate in land, Henry to

have the right, if he had no lineal descendants, to will the property to lineal descendants of the testator. . Henry had no lineal descendants and willed the land to his brother Thomas, who was a lineal descendant of the testator and therefore a proper devisee, but the devise was upon the condition that Thomas pay Henry's debts to his (Henry's) wife and others, amounting to $7000 and pay to Henry's wife an annuity of $600 per annum. Thomas could not claim the devise without complying with the conditions upon which it was made. Neither Henry's wife nor the other persons to whom Henry was indebted were of the class to whom he was permitted, by the terms of the devise to him, to devise it. The attempted devise, therefore, ran counter to the same principle which invalidated the attempted appointment in *Matter of Carroll, supra,* that is, it required an agreement on the part of Thomas to divert a portion of the devise to the benefit of persons not within the class to whom the land could be devised.

*Degman* v. *Degman,* 98 Ky. 717, 34 S. W. 523, also cited by petitioners, presents the following facts: J. C. Degman devised all of his estate, after the payment of his debts, to his wife Clarissa, "the said property to be disposed of by her among my children as she may think best." Two hundred fifty acres of land owned by the testator at the time of his death were sold to pay his debts and were bought by his widow and her second husband Jack Sweet. Sweet afterwards conveyed his interest to his wife.

It was held that the devise gave to Clarissa a life estate in the land, with power to divide the same between testator's children as she thought best and that only her life estate passed by the sale of the 250 acres. The widow included the 250 acres in the division. To one son she

deeded 238 acres, worth very much more than the part deeded to either of the other children. The deed recited that the grantee was to pay his mother's debts and also to care for and support his mother and her then husband during her life. A tract of 240 acres was conveyed to two other sons charged with the payment of $400 to their sister, to whom a tract of 61 acres was conveyed. The 240-acre tract was afterwards partitioned by the sons to whom it was conveyed. One of the sons to whom the 240-acre tract was conveyed and the daughter to whom the 61-acre tract was conveyed brought suit, after the death of their mother, against the other two sons for settlement of the estate and to have all of the deeds set aside and the lands divided among the four children.

The court, in reversing a judgment dismissing their suit, said: "It is perfectly manifest that the chief, if not the sole, reason that induced Mrs. Sweet to make the deeds as she did was to secure the payment of her debts, and provide for the care and maintenance of herself and husband, and, to make this certain, she retained a lien on the land conveyed to C. C. Degman to secure the performance of the conditions and agreement. It would hardly be contended that Mrs. Sweet could have sold enough of this land to have paid her debts, nor could she have invested her second husband with any title to it beyond her life estate, and yet if this division should be upheld the same thing in effect would be sanctioned and approved. To hold that the division is valid and the conditions imposed void would be still more inequitable. That Mrs. Sweet should desire that her debts be paid and her husband taken care of was natural and commendable, yet she had no power to so apply or use the trust property. For the reasons indicated the judgment of the court below is reversed and cause remanded, with directions to cancel

the deeds made by Mrs. Sweet, and also cancel the deeds of partition made by Thomas P. and U. P. Degman; also to disallow any and all claims for improvements, as well as charges or claims for rents, and to cause the lands in contest to be equally divided between the four children of Julius C. Degman, and for proceedings consistent with this opinion."

It is the contention of the respondents that the proper test to be used in determining whether an appointment made by a donee with an intention to secure a benefit to himself or to one not an object of the trust is fraudulent, is whether the appointee is bound to carry into effect the intention of the donee or whether the appointee need not comply with the donee's wishes unless he so desires.

In support of this contention they cite *In re Crawshay*, 43 Ch. D. (Eng.) 615; *Birley* v. *Birley,* 53 Eng. Rep. 651; *Portland* v. *Topham,* 11 Eng. Rep. 1242; *Topham* v. *Duke of Portland,* 5 Ch. App. 40; *Glenn* v. *Glenn,* 21 S. C. 308, 37 S. C. Rep. 132.

*In re Crawshay, supra,* involved an appointment by the donee of a special power whereby he appointed certain sums to his children, who were objects of the power, but the appointments were made upon certain trusts for the benefits of nonobjects of the power. He then provided that if he had exceeded his power, the appointment to his son Robert should be absolute "but who will, I am assured, settle the same voluntarily in the manner in which I have attempted to settle the same as aforesaid, so as thereby to carry out my wishes." In holding the attempt to impress a trust upon the appointment to Robert bad and the absolute appointment to Robert good, the court said: "Then the only question is, whether the £10,000 thus given to *Robert* is so given to him for the purpose of his applying it for the benefit of persons who are not objects of the

power that the gift must fail. The phrase, 'who will, I am assured, settle the same voluntarily,' is capable of different meanings. * * * But if, on the other hand, the fund is really given, as it purports to be, to *Robert* absolutely, not subject to any trust, but that he might do what he liked with it, and if the word 'voluntarily' is truly used, then, if he does settle it as the testator says he should like him to do, and as he endeavoured to do himself, that would be an entirely voluntary act on *Robert's* part, and the appointment to him would be valid. There is no evidence of any conversation, or arrangement, or bargain, or even of any understanding between the father and son, or that the son had any knowledge that there was any such provision in the will, before the will was opened after the testator's death and the contents made known to the family; and, even if the son did know of the provisions in the will before the testator's death, yet, unless it was made known to him under circumstances which shewed that he had accepted a trust, and had bound himself to carry out his father's wishes, I do not think his knowledge would make the gift invalid. In my opinion, the real meaning of the word is, not that *Robert* was bound to settle the fund, but that it was given to him absolutely, and that the testator, having shewn what he wished done by trying to do it himself, and having on this hypothesis failed in doing it, left it entirely to his son whether he would or would not settle the fund upon the daughter. In point of fact, the son has settled it; but that is immaterial, if it was absolutely free to him to deal with the fund as he pleased."

In *Birley* v. *Birley, supra,* the test of the validity of an appointment in such a case as this is stated as follows: "The question in all these cases is this: in what character did the appointee take the property? if he took absolute-

ly, he might do with it as he pleased: but if in trust for the donee of the power and to effect that which it was not within the authority of the donee to effect under the terms of the power, then it is illegal and amounts to nothing."

In *Portland* v. *Topham, supra,* the chancellor said: "The truth, therefore, was, that Lady Harriet was never placed * * * in the position of a person having the absolute ownership of the fund, and left at liberty to deal with the whole, or any part of the fund, in such manner as she should think right. The Duke, by his agents, controlled the whole of the disposition of the fund. Lady Harriet states (of which there can be no possibility of doubt) that she herself was entirely ignorant of the fact that she had, or was intended to have, any absolute interest or control in or over these funds; and that in what she did for the purpose of giving effect to what the Duke originally desired should be done, but which he had been told could not be legally done, she acted merely instrumentally * * *. The whole thing, therefore, was, in truth, an arrangement proceeding and emanating wholly from the donee or owner of the power; and it assumed that shape in which it is quite clear, from the very case of the owner of the power, that he was advised that the matter could not be supported."

In *Glenn* v. *Glenn, supra,* David Glenn devised land to his three sons, to be divided equally among them, each son to hold such share during his natural life and after his death to his issue *per stirpes,* but "in case either of my sons shall be desirous of changing his place of residence, or not wish to come to the same to reside on it, he is authorized to sell the land * * * to any of my issue, and to make a good fee simple title to the purchaser, * * * the proceeds of such sale to be reinvested by my said son * * *

subject to the same limitations as are imposed on the land."

The testator's son William went into possession of the part set off to him and thereafter removed to the State of Alabama and conveyed the land to his son A. J. Glenn, who immediately conveyed it to his uncle, George W. Glenn, Sr., for a consideration which was not paid to him but under some arrangement was made to his father. A. J. Glenn was a grandson of the testator and therefore of the class to whom William could convey. George W. Glenn was not a descendant of the testator and therefore not a member of the class to whom William could convey.

The surviving children of William Glenn sued to recover the land, claiming among other things that George W. Glenn, Sr., who was not a descendant of the donor, was really the purchaser of the land; that the two conveyances, first to A. J., and then by him to his uncle, George, were in truth only one from William to George W., which corrupt combination to do by indirection what could not be done directly, was an abuse of the power in the will, and void. The court said: "It seems that the judge below did not think it necessary to consider the view that the conveyance to A. J. Glenn should be entirely ignored, and that alone considered which was made by him to George W. Glenn, as if it had been directly made to him by William himself. Whether the testimony of A. J. Glenn was or was not competent, it is possibly true that the deed from William to A. J. Glenn, was intended merely as one of the links in the chain to carry title to George W. Glenn; but even on that assumption we think we have no right to disregard that conveyance. As William had the power under the will to convey to A. J. Glenn, who was one of the issue and remaindermen, the land after such conveyance undoubtedly became his prop-

erty, with which he could do as he pleased."

There is an extensive note in 115 A. L. R. 930, et seq., on the validity of exercise of the power of appointment in which all of the above cases and many more are reviewed. Further review of the cases would add nothing to what has been said.

In the trust deed as changed by the instrument of August 19, 1932, paragraph 4 is identical with paragraph 7 of the original trust deed, so there was no attempt on the part of the settlor by the change of August 19 to make the deed revocable by his sole act. I think that the same rules of construction which I have applied to the original trust deed apply to the instrument of August 19, 1932, and that the settlor's intention must be determined by giving to the words used their ordinary meaning, in the absence of anything in the instrument or some contemporaneous agreement to deflect them from that meaning. There was no contemporaneous agreement and the language used to appoint the settlor's son as the sole beneficiary to take income and conferring upon him the power of appointment over the corpus of the trust is contained in paragraph 2 of the deed of August 19 as follows: "The Trustee shall pay monthly or at such other periods as he shall determine, all of the net remaining income in the Trust Estate to ALBERT EDMUND LORD, son of the said Settlor, during his natural life, and upon his death said Trustee shall distribute, convey, transfer and deliver all of the said Trust Estate and all of the assets of every kind and sort then a part of the said Trust Estate to such persons as the said ALBERT EDMUND LORD may by his will direct and appoint."

This clearly gave to Albert Edmund an absolute gift of the income for life, with power to appoint by will those to take corpus upon his death, all subject to the reserved

right in the settlor to again shift the gift to others. Had the settlor died without anything further having been done, thus terminating the settlor's reserved right to change what he had thus far done, Albert Edmund would then have had a completely vested right to the benefits of the trust, with power to appoint those to take the corpus upon his death. The appointee, having entered into no bargain or understanding whereby either the corpus or income was impressed with a trust to the use of the settlor, the case comes clearly within the rule applied in the decisions reviewed and the appointment was not invalid by reason of the alleged undisclosed plan of the settlor not agreed to by the appointee.